# UNITED STATES DISTRICT COURT
## District of Kansas
(Wichita Docket)

**UNITED STATES OF AMERICA,**

       **Plaintiff,**

       **v.**                                 **CASE NO. 24-10013-JWB**

**SHAN HANES,**

       **Defendant.**

## UNITED STATES' SENTENCING MEMORANDUM

The United States respectfully requests a sentence of 264 months imprisonment for the defendant, Shan Hanes', conviction for Embezzlement by a Bank Officer. Further, the United States recommends this Court impose a 5-year term of Supervised Release with the Standard, Mandatory, and Special Conditions as recommended in the Amended Presentence Investigation Report (PSR) (Doc. 22), and a $100 special assessment as required by 18 U.S.C. § 3571(b). A term of 264 months imprisonment is the just and appropriate sentence for the defendant in view of the sentencing factors under 18 U.S.C. § 3553(a). Specifically, the United States contends that a 264 month sentence is sufficient but certainly not greater than necessary to meet the objectives outlined in 18 U.S.C. § 3553(a).

I.      **Procedural History**

On May 23, 2024, the defendant pled guilty to Count 1 of the Information (Doc. 1). charging a violation of 18 U.S.C. § 656, that is, Embezzlement by a Bank Officer. By entering into the Plea Agreement, the defendant admitted to knowingly committing the offense, and to being guilty of the offense. (Doc. 16, ¶ 1). The maximum sentence which may be imposed as to Count 1 of the Information to which the defendant pled guilty is not more than 30 years' imprisonment, a fine up to $1,000,000, a term of supervised release of up to 5 years and a $100.00 mandatory special assessment. *id.* The defendant further agreed to the forfeiture of property to the United States, and restitution payable to the identified victims. (Doc. 16, ¶¶ 1, 8-9).

In exchange for this plea, the United States agreed 1) to not file additional charges against the defendant arising out of the facts forming the basis for the present Indictment; and 2) to allow the defendant to request a downward departure while the United States would recommend a sentence no higher than the high end of the United States Sentencing Guideline (USSG) range. (Doc. 16, ¶ 5).

II.     **Factual Background**

Heartland Tri-State Bank (HTSB) was a small, rural, financial institution located in Elkhart, Kansas. The defendant, along with a host of investors, formed the Elkhart Financial Corporation to purchase HTSB's predecessor and invest in the (presumed) success of HTSB. Elkhart Financial Corp. was a holding company invested solely in the

existence of HTSB. The victims' investment in Elkhart Financial Corp. only remained if HTSB continued.

Heartland Tri-State Bank failed on July 28, 2023. The defendant, Shan Hanes serving as HTSB's Chief Executive Officer (CEO), had wired out $47.1 million of bank funds. Essentially, $47.1 million of the bank's deposits were jettisoned into the ether with a misguided, and criminal, intent to convert those funds into cryptocurrency "investments." In only 8-weeks, from May 16 through July 7, 2023, the defendant's attempts to purchase cryptocurrency made HTSB non-viable, while he concealed the truth of his activity from HTSB employees and investors.

The Federal Bureau of Investigation (FBI), and the Office of Inspector General (OIG) for the Federal Deposit Insurance Corporation (FDIC), Federal Reserve Bank (FRB) and Federal Housing Finance Agency (FHFA) responded immediately and conducted an investigation.

In December 2022, Shan Hanes began making financial transactions to purchase[1] cryptocurrency. The cryptocurrency purchases appeared to be precipitated by communication with an unidentified co-conspirator on the electronic messaging app "WhatsApp". To date, the true identity of the co-conspirator, or conspirators, remain unknown.

---

[1] "Purchase" for purpose of this memorandum, entail the transfer of United States Currency, using HTSB funds, under the care, custody or control of the defendant to various cryptocurrency banks or exchanges for the purported conversion into some form of cryptocurrency product.

The initial cryptocurrency purchases were made with the defendant's personal funds. However, in early 2023 the cryptocurrency purchases were made with funds the defendant embezzled from the Elkhart Church of Christ and the Santa Fe Investment Club[2].

In May 2023, the scheme[3] accelerated and the defendant began to make wire transfer transactions from HTSB, using HTSB funds, for the purpose of purchasing cryptocurrency. Continued electronic communications between the defendant and the co-conspirator illustrate a common pattern. First, there is an initial "investment" followed by another transaction required to secure or guarantee those funds. Further "investments" may be made, but always require another need for funds, to guarantee or unfreeze the earlier transfers. This pattern is clearly represented in the defendant's embezzlement.

| Approx. Date of Wire | Amount | Transfer |
| --- | --- | --- |
| 5/17/2023 | $5,000 | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 5/30/2023 | $1.5 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 5/31/2023 | $1.5 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |

---

[2] As noted in the defendant's sentencing memorandum, these embezzled funds have been repaid to the Church and the Investment Club. (Doc. 26 at 5).

[3] As noted in the FRB investigation, this scheme is often referred to as "pig-butchering." According to an alert issued by the U.S. Department of the Treasury's Financial Crimes Enforcement Network (FinCEN), this scam involves a scammer convincing a victim (a pig) to invest in supposedly legitimate virtual currency investment opportunities and then steals the victim's money – butchering the pig.

| Approx. Date of Wire | Amount | Transfer |
|---|---|---|
| 6/2/2023 | $3.5 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 6/2/2023 | $3.2 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 6/14/2023 | $10 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 6/20/2023 | $1.4 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 6/23/2023 | $10.3 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 6/27/2023 | $3.3 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 7/5/2023 | $8 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |
| 7/7/2023 | $4.4 million | Wire transfer caused by defendant from HTSB to Payward Ventures. |

Ultimately, the lure of easy money quickly results in the complete loss of all funds. It was particularly "easy money" in this case as the defendant used his position and authority as CEO of Heartland Tri-State Bank to make and authorize the wire transfers or direct other HTSB employees to make the wire transfers on his behalf. It was certainly devastating in this case when the defendant had access to such a large amount of money. It was terribly quick in this case, as the defendant embezzled those funds in a short 8-week period.

The defendant Shan Hanes did not have authority to make these wire transfers, investments or transactions using HTSB funds to purchase cryptocurrency. To further his scheme, and conceal the scheme, the defendant made many misrepresentations to various people to secure access to and transfer the funds. The defendant directed HTSB employees to make the wire transfers and lied to HTSB employees about the purpose of the transfers. HTSB had policies in place to attempt to curb such risk, but since the defendant was the CEO, with the ultimate responsibility to ensure the integrity of the institution, his willingness to wholly betray that responsibility bypassed those safeguards. Put simply, he had the power to order the transactions, and his reputation and the respect he garnered from employees, members of HTSB board of directors and the community, afforded him the ability to use it without being questioned, at least initially. Later, after millions continued to flow from HTSB, the defendant was questioned about his activity. At this point the defendant actively lied to the employees and board of directors. He denied that cryptocurrency was involved. He induced a bank investor to act as unwitting cover for one large transfer. The defendant used the investor's HTSB account as a pass-through to convert HTSB funds into a wire transfer for cryptocurrency. This was the $8 million wire transfer on July 5, 2023.

**III.   Sentencing in General**

As a matter of administration and to secure nationwide consistency in sentencing, the Guidelines should be the starting point and the initial benchmark for sentencing. *See*

*Rita v. United States*, 551 U.S. 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). However, the Guidelines are not the only consideration. *See United States v. Booker, 43* U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d. 621 (2005). The sentencing court must engage in a three-part analysis to determine the appropriate sentence. First, the court must consider the Guideline range. A sentence within the guideline range is presumed reasonable. *United States v. Kristle*, 437 F.3d 1050, 1055 (10th Cir. 2006).

Second, the court must address any grounds for departure provided in the policy statements. A departure is a deviation from the calculated guidelines range based on the enumerated departure provisions in the Guidelines Manual. On the other hand, a variance occurs when the district court deviates from the guidelines range based on the sentencing factors in 18 U.S.C. § 3553(a) and the court's responsibility to impose a sentence that is "sufficient" but "not greater than necessary" to meet the sentencing objectives in that provision. *United States v. Kaspereit*, 994 F.3d 1202, 1214 (10th Cir. 2021)(internal citations omitted). *See also* 2021 Guidelines Manual, § 1B1.1, pg. 17-18.

Third, the court last considers the factors under 18 U.S.C. § 3553(a). *See Rita*, 551 U.S. at 351. 18 U.S.C. § 3553(a) provides seven statutory factors for the court to consider to impose a sentence that is sufficient, but not greater than necessary: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for a sentence to reflect the seriousness of the crime, deter future criminal conduct, prevent the defendant from committing more crimes and provide

rehabilitation; (3) the sentences that are legally available; (4) the sentencing guidelines; (5) the Sentencing Commission's policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need for restitution. The sentencing court can and should engage in a holistic inquiry of these factors. *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014).

On appellate review, the court applies a two-step process. First, the court confirms the district court correctly calculated the Guideline range. Second, the court examines under an abuse of discretion standard, the substantive reasonableness of the sentence, considering the totality of the circumstances including the extent of any variance from the Guidelines. *Gall v. United States,* 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).

## IV. Amended Presentence Investigation Report and the Defendant's calculated guideline range

The United States Probation Office conducted a pre-sentence investigation and determined the properly calculated sentencing range to be 235-293 months imprisonment. (Doc. 22, ¶ 87). The guideline calculation was primarily driven by a host of aggravating factors and the defendant's specific role and characteristics. The base offense level, specific characteristics and defendant's acceptance of responsibility result in a total offense level of 38. (Doc. 22, ¶ 46-57).

A.  **The loss "characteristic"**

The USSG provide for a 22-level increase in offense level based on the loss suffered in this case, specifically $47,105,000 in HTSB funds. Consequently, the loss and subsequent collapse of the bank caused further loss to shareholders of the Elkhart Financial Corporation, the holding company with capital investment in HTSB. These losses are approximately $9.2 million, the cost-basis of direct investments, excluding the increases in stock value.

B.  **Substantial financial hardship**

The USSG provide for a 6-level increase for offenses resulting in substantial financial hardship to 25 or more victims. Once HTSB became insolvent, the shares of Elkhart Financial Corporation were valueless. Each investor had the entire value of their contributions disappear. This includes the original capital investment, stock value gains and expected future income from potential dividends. The investment loss resulted in a substantial impact of the victims' retirement plans, available funds, lifestyle choices, future financial security and current stability.

C.  **Jeopardizing a financial institution**

The USSG provide for a 4-level increase if the offense of conviction substantially jeopardizes the soundness of a financial institution. As a result

of the fraud committed by the defendant, HTSB became severely under-capitalized and failed as an ongoing financial institution. The FDIC was

### D. Abuse of a position of trust

The USSG provide for a 2-level enhancement for a defendant's abuse of a position of trust that significantly facilitated the commission or concealment of the offense. During the course of the embezzlement the defendant was the CEO of HTSB. Additionally, the defendant was employed by the predecessor of HTSB and was instrumental in gathering investors to purchase the financial institution that would become HTSB. The defendant was the chairman of the Kansas Banker's Association in 2021 and 2022 and served on other national and local finance-related committees.

## V. Restitution

The United States requests the Court schedule a restitution hearing on a later date, but withing 90-days of the sentencing hearing conducted on August 19, 2024. 18 U.S.C.§ 3664(d)(5). The United States Probation Office and the defendant support this request.

The losses attributed to the defendant's embezzlement are staggering with concomitant restitution requests. However, the valuation and extent of permitted claims is not yet settled. As to Elkhart Financial Corp., the United States

Attorney's Office provided the USPO with losses ranging between the initial stock purchase cost-basis and the final stock "value" reported prior to the failure of HTSB. However, Elkhart Financial Corp. victims supported their requests with varying amounts of paperwork. When those differences are multiplied across 35 different ownership groups it creates an opportunity for the parties to create more clarity in the requests.

Additionally, some of the named ownership groups have not requested restitution or provided information to certify associated losses. Further, some victims have made restitution requests based on claims not related to direct investment, but may still be deemed by the Court to be direct and proximate harm. Finally, the FDIC is a named victim in the instant case. As receiver for HTSB, the FDIC steps into the shoes of HTSB as a non-governmental victim, and the FDIC makes specific requests as to its standing and pro rata share in relation to Elkhart Financial Corp. victims. (Doc. 22-1). This position is contrary to the USPO's position (Doc. 22, ¶ 120) and different than the defendant's assumption. (Doc. At 5). The subject is worth clarifying for the Court.

Excising the restitution issue from the main sentencing will also allow the United States Attorney's Office to gain insight into possible asset forfeiture and restitution collection efforts. This may inform the Court's decisions at a later hearing. At the August 19 sentencing the Court will be free to focus on the specific

factual and legal circumstances relevant to the defendant and victims without the distraction of possibly highly technical but non-thematic arguments.

## VI. United States' Argument

### A. Sentencing Purposes

Title 18 United States Code, Section 3553(a)(1) instructs a sentencing court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." Subsection (a)(2)(A) instructs, in part, a sentencing court to consider the need for the sentence imposed "to reflect the seriousness of the offense" and "to promote respect for the law." *Id*. Subsection (a)(2)(B) instructs a sentencing court to consider the need for the sentence imposed "to afford adequate deterrence to criminal conduct." *Id*. Subsection (a)(2)(C) instructs a sentencing court to consider the need for the sentence imposed "to protect the public from further crimes of the defendant." *Id*.

The result of the defendant's criminal activity was the failure of a bank, flatlining of its financial holding company, the erosion of a community's sense of trust and the permanent alteration of many citizens' financial futures. As reflected in the USSG guideline calculation and application of the numerous aggravating factors, this offense is of an egregious nature rarely seen in white-collar prosecutions in the District of Kansas.

The public deserves authenticity and honest service from people in positions of trust. The United States values and relies upon the safety and security of the financial system and its institutions. Citizens cannot afford the system and institutions to be put at risk, for whatever reason. Vulnerability to criminal activity can be devastating, as it was here. Thus, a robust sentence is necessary to deter further criminal conduct by any potential threats and promote respect for the law. The lure of easy money cannot be allowed to outweigh the threat of punishment, or the crime will be perceived as worth the risk.

While it may seem unlikely the public is at risk from further crimes of the defendant, the pattern of criminal activity in this case causes some pause. The defendant invested his own funds into cryptocurrency, arguably to "get rich quick", and pivoted to using money from his Church and Investment Club. Once those funds were not enough, he dipped into the HTSB coffers. It is a pattern of escalating behavior. It shows an evolution in his criminal activity.

### B.    **Sentencing Factors**

The United States agrees the defendant has no criminal history. The matter pending in Morton County, Kansas encompasses the same embezzlement activity described herein.

The United States acknowledges the defendant was quick to accept responsibility. The defendant, through his attorney, engaged with the United States Attorney's Office soon after it was clear a criminal investigation was pending. He voluntarily surrendered his passport prior to charges being filed. The defendant entered a plea to an Information, waiving his right to indictment by a Grand Jury.

The defendant has cooperated with the United States Attorney's Office in the collection such small amounts of restitution available to this point. The repayment of restitution is of critical concern to the United States and the victims in this case. However, full recompense appears nearly impossible no matter what age the defendant has available in his working years. Further, with the large number of victims and staggering loss, any restitution would be spread quite thin. Factoring in the FDIC as a victim, that sustained a loss caused by $47.1 million of direct embezzlement, any measurable impact to a single victim is highly unlikely.

## VII. <u>Conclusion</u>

Most, if not all, of the individuals the defendant deceived were also Elkhart Financial Corp. investors, and current or former residents of the City of Elkhart. Each held the defendant in high esteem, valued his perceived financial acumen and viewed him as a neighbor. The defendant was supposed to lead the bank and community. HTSB represented, quite literally, a critical investment of each victim in their future. It was a

part of retirement plans, estate planning, succussion planning and investment in the community.

The investment, financial and personal, can never be restored.

The defendant's conduct, measured by the 18 U.S.C. § 3553(a) factors, deserves a stringent punishment. The nature and circumstances of the offense, need for adequate deterrence weigh heavily in favor of United States' recommended sentence. The public and the financial system at-large deserve confidence in their institutions and the authorities responsible for that trust. The Court must protect the community from further crimes of the defendant while promoting respect for the law and providing deterrence.

**WHEREFORE**, the United States moves this Court to impose a sentence within the properly calculated Guideline range, specifically, 264 months imprisonment followed by a five-year term of supervised release.

    Respectfully submitted,

    KATE E. BRUBACHER
    United States Attorney

    /s/Aaron L. Smith
    AARON L. SMITH
    Assistant United States Attorney
    United States Attorney's Office
    301 N. Main, Suite 1200
    Wichita, Kansas 67202
    316-269-6481
    aaron.smith3@usdoj.gov
    Ks. S. Ct. No. 20447

## NOTICE OF ELECTRONIC FILING

I hereby certify that on August 14, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Aaron L. Smith
AARON L. SMITH
Assistant United States Attorney