1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF KANSAS
2

3  THE UNITED STATES OF AMERICA,

4              Plaintiff,

5       vs.                          District Court
                                     Case Number
6  SHAN HANES,                       24-10013

7              Defendant.

8

9              TRANSCRIPT OF PROCEEDINGS

10

        On the 19th day of August, 2024 at 1:30 p.m. came
11  on to be heard in the Sentencing Hearing in the
    above-entitled and numbered cause before the HONORABLE
12  JOHN W. BROOMES, Judge of the United States District
    Court for the District of Kansas, Sitting in Wichita.
13       Proceedings recorded by mechanical stenography.
         Transcript produced by computer.
14

15  APPEARANCES
16
        The Plaintiff appeared by and through:
17  Mr. Aaron Smith
    United States Attorney's Office
18  301 N. Main, Suite 1200
    Wichita, Kansas 67202
19
        The Defendant appeared in person, by and through:
20  Mr. John Stang
    310 W. Central Ave, Suite 111
21  Wichita, KS 67202

22

23

24

25

08/19/2024     USA v. HANES     24-10013     2

```
1          (The following proceedings commenced at 1:03 p.m.

2   and have been requested transcribed:)

3          THE COURT:  Please be seated.

4      This is Case Number 24-10013, United States versus

5   Shan Hanes.

6      May I have appearances, please.

7          MR. SMITH:  Your Honor, the United States

8   appears by Assistant U.S. Attorney, Aaron Smith.

9          MR. STANG:  May it please the Court.  John Stang

10  on behalf of Mr. Hanes, who is seated to my right at

11  counsel table.

12         THE COURT:  Thank you.

13     Mr. Hanes, can you understand everything that is

14  being said in the courtroom today?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  This matter comes on for sentencing.

17     Anything we need to take up before we proceed to

18  sentencing?

19         MR. SMITH:  Not by the United States.

20         MR. STANG:  Not by the defense, Your Honor.

21         THE COURT:  Swear the defendant.

22     [Oath given.]

23         THE COURT:  Are you Shan Hanes?

24         THE DEFENDANT:  Yes.  Yes.

25         THE COURT:  How old are you?
```

1          THE DEFENDANT:  Fifty-three.

2          THE COURT:  On May 23rd, 2024, you pled guilty

3   to a single count of embezzlement by a bank officer, in

4   violation of 18 U.S. Code, Section 656, and Section 2.

5          At the end of that hearing I directed preparation

6   of a presentence report.  I now have the amended

7   presentence report in front of me.  It's filed at Docket

8   Entry 22 in this case.

9          It includes an addendum, indicating no objections

10  by either party.

11         In addition to that, I have a Sentencing

12  Memorandum filed by the defendant at Docket Entry 26, the

13  Government Sentencing Memorandum filed at Docket Entry

14  27, and I have a lengthy stack of victim impact

15  statements and letters to the Court.  I've read all these

16  materials.

17         Have the parties had an opportunity to review all

18  these materials and are there any objections or

19  corrections to the presentence report?

20         MR. SMITH:  I have reviewed the materials, and I

21  have no objection or correction.

22         MR. STANG:  Your Honor, we have reviewed the

23  materials.  We have no objection or correction.

24         THE COURT:  Thank you.

25         Mr. Hanes, have you had the opportunity to review

1  the presentence report and go over it would your counsel?

2          THE DEFENDANT:  Yes, I have.

3          THE COURT:  Are you satisfied with his

4  representation in this matter?

5          THE DEFENDANT:  Yes, Your Honor.

6          THE COURT:  Very well.  Since there are no

7  objections to the presentence report, I make the

8  following tentative findings based on that report:

9          Total Offense Level is 38, Criminal History

10 Category is I, gives the following statutory constraints

11 on sentencing:

12         Custody up to 30 years, followed by supervised

13 release of up to five years, not eligible for probation,

14 fine $1 million, restitution $58,531,864.96, special

15 assessment $100.

16         Under the advisory sentencing guidelines it calls

17 for custody from 235 months to 293 months, followed by

18 supervised release of two to five years, not eligible for

19 probation, fine 50,000 to $1 million, restitution

20 $58,531,864.91, special assessment of $100.

21         Have all the victims been notified in this matter?

22         MR. SMITH:  They have, Your Honor.

23         THE COURT:  I'm ready to take up sentencing

24 arguments, beginning with the Government.

25         When do you want to present the opportunity for

08/19/2024    USA v. HANES    24-10013    5

```
1  victims to make statements?
2          MR. SMITH:  Your Honor, I would like to make my
3  statement and then invite the victims up to make their
4  statements.
5          THE COURT:  Very well.
6          MR. SMITH:  Thank you, Your Honor.
7      I would like to first hit on some themes, and I
8  think the themes are very evident from what the victims
9  have relayed in their victim impact statements.  And,
10 quite frankly, the overwhelming and the most prevalent
11 theme was the idea of trust that the victims in the
12 community had in this defendant.  But trust is not a
13 title, or an award, or a pin that you can put on your
14 jacket.  It is earned.  But it also imposes certain ideas
15 and responsibilities on a person.
16      I would call that in this circumstance the burden
17 of trust.  Trust is something that demands
18 responsibility.  It demands authenticity.  Trust requires
19 loyalty and humbleness.  A trusted person obviously, and
20 often, exhibits altruism, introspection, or empathy.
21      In contrast, greed and arrogance do not have those
22 burdens.  The vices are selfish and destructive.  They
23 consume trust and its characteristics.
24      In this case, those vices consumed a bank with a
25 loss of $47.1 million to the bank, the depositors, to the
```

08/19/2024    USA v. HANES    24-10013    6

1  Federal Deposit Insurance Corporation.

2       They consumed the investors' entire capital of the

3  Elkhart Financial Corporation, the holding company that

4  invested in purchasing this bank and relied on that

5  investment for their future plans.

6       It consumed retirements, mental and physical

7  health.

8       It consumed the relationships the community and

9  the bank were built upon, and faith in a person, and a

10 community.

11      I understand that the sentence that we're

12 discussing today is quite significant and lengthy.  It's

13 likely even no matter what sentence is handed down today,

14 that there will be people leaving the courtroom that will

15 be left wanting.  Any time we find ourselves in these

16 forums, you know these sorts of circumstances, it seems

17 like there is never a perfect result but we are here to

18 strive to do justice in this case.

19      As reflected in the United States' Sentencing

20 Memorandum, we are requesting a 264-month sentence.  That

21 sentence is within the calculated and recommended

22 sentencing guidelines range that the Court announced.

23      The factors that contribute to such a high

24 sentencing range on a white collar case, and are quite

25 uncontroverted and evident in this circumstance, first,

1  22 levels for the amount of loss.  There's really not

2  much of a discussion.

3       $47.1 million was wired right out from under the

4  noses of the depositors, the officers, and the employees

5  of the bank.  It's a significant loss.  And, obviously,

6  the amount of loss that is sufficient to undercapitalize

7  and destroy that financial institution.

8       Six points are added for causing substantial

9  financial hardship to a number of persons, and that

10 guideline factor is quite evident by just looking out on

11 the court today, by reviewing the number of victim impact

12 statements that were submitted.

13      These people lost their retirements, their

14 livelihood, and as described in many of the statements,

15 an opportunity to provide for the future.

16      It was a generational harm, as was reflected in

17 one of the victim impact statements.  It's also a harm to

18 the community and the trust and the fabric that was

19 present in Elkhart, Kansas.

20      Four points were added if the actions jeopardized

21 the safety and soundness of a financial institution and

22 in this case, it is also not controverted that that

23 safety and soundness was severely jeopardized because the

24 bank failed.  In a one-week period when the regulators

25 showed up on a Monday to essentially do the post-mortem,

08/19/2024    USA v. HANES    24-10013    8

1  or dissection of the frauds that occurred with that

2  financial institution, it was determined by Friday that

3  the bank was undercapitalized and would fail.

4       The bank was placed into receivership by the

5  office of the State Banking Commissioner, and the

6  receiver was the Federal Deposit Insurance Corporation.

7       A buyer was desperately and rapidly then found to

8  attempt to step in and try to salvage anything that could

9  be salvaged to provide some sort of banking resource for

10 the community.

11      I understand that it probably isn't viewed as an

12 ideal solution in this case because this was not just a

13 community bank, but an institution that was invested in

14 not only financially, but emotionally by the citizens of

15 Morton County in Elkhart, but it was the solution that

16 the banking regulators were left with.

17      And, finally, going back to the theme of trust,

18 the defendant received a two-level increase for a

19 violation of a position of public or private trust.  And

20 in this case I think it's evident that it was a violation

21 of both public and private trust.

22      The victim impact statements are replete with

23 references to the defendant's role in the community, his

24 involvement in other activities, and leadership positions

25 in the community.  Being, essentially, a lifelong

1 resident, working in the predecessor to the Heartland

2 Tri-State Bank, and then becoming the head of the

3 Heartland Tri-State Bank.  Those were positions of

4 private trust and public trust that were violated.

5          I understand that the defense does have factors to

6 argue, and they have represented it in their sentencing

7 memorandum.  It is true the defendant has no criminal

8 history.

9          It is true that the defendant made quick and early

10 steps to cooperate, to plead to an information, and not

11 require an indictment.

12          He did turn over his passport pre -- well,

13 precharging in this case.

14          He has made efforts to expedite the proceedings,

15 and that is a factor that the Court may take into

16 consideration.

17          And I understand that there is an argument as to

18 comparing the possible sentences in this case to other

19 sentences that have recently occurred in the country.

20          There is a citation to a Western District of Texas

21 case.  The defendant in that case did embezzle

22 approximately $109 million over a six-year period.  Those

23 were grant funds to the United States Army that were

24 meant for child and youth services at an Army base in

25 Texas.  That defendant received a 180-month sentence.

08/19/2024    USA v. HANES    24-10013    10

1    But as I examined that case, there are many

2    comparisons that we can use to contrast the circumstances

3    here with those circumstances.  I don't want to represent

4    that taking federal government money is a faceless victim

5    because it is not.  And that money that was supposed to

6    go to the United States Army was for child services.  The

7    money, essentially, was taken from potential children and

8    families of U.S. Army veterans and families.

9    But, in this case, the money was taken directly

10   out of the pockets and retirements accounts of people

11   that trusted the defendant.  It was taken from a bank

12   that he was meant to lead.  It was taken from a bank that

13   he had experience in being compliant.

14   This is a person that was a chairman of the state

15   banker's commission, and operated and worked with

16   different other financial boards and institutions.  He

17   knew what his obligations professionally were, and he

18   knew what his obligations to the public were.

19   In looking at the case in Texas, I would also note

20   that there are significant factors in the possible

21   sentencing guideline calculations.  First, the number of

22   victims, and the safety and soundness of the financial

23   institution would not have been factored into the

24   sentencing guideline range for the defendant in the

25   Western District of Texas.

08/19/2024      USA v. HANES      24-10013      11

1        That alone is 10 levels' difference in the offense

2   level here, which is something significant to compare and

3   contrast, because even with zero criminal history points,

4   that results in a possible difference and sentence of

5   nearly 100 months.

6        I do not know in that case if the defendant

7   received the two points for position or

8   public -- position of public or private trust.  I would

9   presume that it was a position of public trust but in any

10  event, if that were true, it is still a difference of

11  nearly 100 months in the sentencing guideline

12  calculation.

13        Your Honor, my sentencing memorandum covered the

14  numerous factors that I think are relevant for the Court

15  to take into consideration and they were in response to

16  the defense's arguments.  I don't want to belabor that

17  which I've argued in that memorandum but I would like to

18  highlight a few points.

19        The purposes under 18 U.S.C. 3553(a) are clear.

20  They have been laid out by the United States.  They have

21  been laid out by the defense.  But one primary purpose I

22  think that is important in this case, is both the nature

23  and circumstances of the offense, and the characteristics

24  of the defendant.

25        Most importantly, it should also afford adequate

08/19/2024      USA v. HANES      24-10013        12

1  deterrence to further criminal conduct.

2        I am not going to make an argument that the public

3  is at risk of the commission of further crimes for this

4  defendant.  One, because I think that recidivism for

5  white collar defendants is typically low, but the

6  sentence imposed here today will be of such significance,

7  that the likelihood of recidivism will not occur.

8        But should we also promote respect for the law, as

9  reflected in 3553(a), and take into account deterrence

10  for criminal conduct?

11       The safety and soundness of the United States

12  financial system is of paramount importance.  There are

13  threats essentially from all sides.  Crime is evolving.

14  Digital intrusions are evolving, and becoming more

15  sophisticated.  The risks to our financial system are

16  only going to increase.

17       For our financial institution to remain stable, to

18  be safe from harm, whom is it that we must look to, to

19  protect the systems and the institutions?

20       The person or the people should be the CEOs; the

21  persons in position of trust; position of power; position

22  of importance; position of education; those respected as

23  leaders in the financial institution and in the

24  community.  And that was one of the great failures of

25  this case.

08/19/2024      USA v. HANES      24-10013      13

1          To afford adequate deterrence of criminal conduct,

2   I would suggest the Court must impose the 264-month

3   sentence that the United States is proposing in this case

4   as an adequate reflection of the crime, of the harm that

5   was done.

6          I also do not want to detract in that circumstance

7   by making it only about the institution and the financial

8   system when there is also a human element most

9   specifically in relation to this case and that will be

10  reflected by the statements of the victims.

11         The victims will speak and they will add the layer

12  of emotion and loss that they have felt, the continued

13  loss that they and their families expect to feel, and for

14  that reason, an adequate sentence is also necessary to

15  vindicate the loss and impose a just sentence for those

16  victims.

17         Your Honor, I would like to highlight a couple

18  points of distinction factually, because I also

19  understand that there is, I would say, a specter that

20  this was part of a fraud.

21         Phrases have been used about pig butchering,

22  scams, cryptocurrency scams, et cetera.

23         It is true that this money was transferred from

24  the bank into cryptocurrency, and that cryptocurrency

25  very quickly was disbursed and disappeared.  The final

08/19/2024    USA v. HANES    24-10013    14

1  location or resting point of the cryptocurrency is not

2  known.

3        But as reflected in the presentence report, and

4  the sentiments of the victims, this defendant had an

5  opportunity, one, to know better;

6        Two, to be loyal and honest and trustworthy to his

7  community, friends, family members and to the financial

8  institution itself.

9        The crime, the fraud -- because at some point it

10  is no longer a scam, it is just a fraud scheme, the crime

11  he participated in was, again, at the first, his money or

12  own money that he embezzled from an investment club and

13  from the church.

14        At that point I understand that his position may

15  be he was part of this scam, which I will call a fraud.

16  But there becomes an inflexion point which then truly

17  makes this a fraudulent criminal activity.

18        As a matter of fact, on May 11th of 2023,

19  approximately six days before the first wire out of

20  Heartland Tri-State Bank, this defendant contacted a bank

21  employee to try to send an initial wire from Heartland

22  Tri-State Bank to the purchase of cryptocurrency.  That

23  was May 11th.

24        That employee questioned that transfer and refused

25  and so there -- there was this reprieve, essentially, for

1  about a six-day time period wherein the defendant could

2  have taken a moment of pause, introspection, reflection.

3       But on May 17th of 2023 he persisted, and at that

4  point willfully embezzled, as is required by the law, the

5  conviction, funds from Heartland Tri-State Bank, and sent

6  the first wire out from Heartland Tri-State Bank to this

7  institution that we have named as Payward Ventures.  That

8  May 17th wire was a small amount.  I would say a test:

9  $5,000.

10       But then on May 30th, May 31st, it quickly

11  ballooned to $1.5 million for each wire on those

12  two -- on those two days.

13       Three days later, after May 31st, it jumps to $3.5

14  million, 3.2 million.

15       That, Your Honor, was not his money, or at least

16  money that he embezzled he himself personally from the

17  church, or the investment company, that was the bank's

18  money.  That was the willful embezzlement and willful

19  misapplication of those funds.

20       That May 11th was his opportunity to change, to go

21  back, to make a different decision, to admit a mistake,

22  as was also one of the statements made in the victim

23  impact statements.  But he did not.

24       And so was it ego or greed?  Another phrase used

25  by the victims in their victim impact statements.  We

08/19/2024    USA v. HANES    24-10013    16

1  don't know.  But he persisted.  And then willfully

2  misapplied 4.7 -- I'm sorry $47.1 million of the bank's

3  funds.

4        There are some questions raised by the victims in

5  their victim impact statements, and I'll take an

6  opportunity just to touch on some of those subjects.

7  They may be questions that the Court has itself.

8        We don't really know what started this.  We have

9  very little information as to what occurred before May of

10 2023.

11       We don't know what the communications were.  We

12 don't know what the inception of the fraud or the scheme

13 was.  All we know is that there were conversations from a

14 messaging app between the defendant and a person that I

15 sometimes identify as a co-conspirator, unknown

16 co-conspirator, co-conspirators.

17       We know that banking regulators didn't have an

18 opportunity to catch this fraud.  As was reflected by the

19 Federal Reserve, the bank had some reporting requirements

20 that they had complied with.  The last reporting

21 requirement, or their call report was on March 31st of

22 2023, and all appeared to be well.

23       The next call reports were due on June 30th of

24 2023.

25       Or, I'm sorry, that period would have ended on

1  June 30th, 2023, the reporting would have been due at the

2  end of July.

3         What we know from the behavior here, and the wire

4  transfers out, is that all of this activity, this $47.1

5  million in loss, occurred between May 17th and the end of

6  July, or mid of July, 2023, within the time period of

7  those reports.

8         The regulators didn't have a chance.  It was a

9  staggering loss in an extremely short amount of time.

10        We know, as reflected by the investigation and

11 reports from the Federal Reserve, and the FBI, that as

12 our investigators got involved in late July of 2023,

13 there was no chance to catch up to the money; it was

14 gone.  It was transferred out.

15        As described, it was quickly spider webbed into a

16 host of different cryptocurrency accounts.  Some real

17 trails to follow, some fake trails to follow; real

18 accounts to seize, fake accounts to seize.  But as the

19 Federal Reserve and the FBI would acknowledge, the money

20 was gone.  There was no chance to recover the funds.

21        There is no indication that anyone knows where it

22 is at this point, or how to access it.

23        That is one of the dangers inherently with

24 cryptocurrency and schemes involving it.

25        To address the last few issues, Your Honor, we had

08/19/2024    USA v. HANES    24-10013    18

1  a conference with the Court on Friday to discuss the

2  issues of restitution, and the parties have requested

3  that the restitution be held at a later date, within 90

4  days, as authorized by the statute.

5       And I think that we covered some of the reasons

6  for that with the Court in the conference on Friday, and

7  my sentencing memorandum also covers what those reasons

8  would be.

9       But, to be clear, we have requested restitution,

10 and the parties have agreed to the imposition of that

11 restitution, and the Court has announced it.

12      We are requesting 47.1 million and $5,000 for the

13 Federal Deposit Insurance Corporation, and in this case I

14 would like to highlight that the Federal Deposit

15 Insurance Corporation is just not a nameless Government

16 entity.  The FDIC not only helped investigate this case,

17 became the receiver for the bank, they covered the losses

18 of the depositors in this case, and worked to keep a

19 financial institution as a going concern in Elkhart.

20      The FDIC is also a necessary component of the

21 United States financial system.  They're there to ensure

22 depositors, to ensure against this kind of loss.  They

23 provide the backdrop for the state banking industry or

24 the national banking industry.  And it's a necessary

25 component.

1    We have also requested restitution for the

2  investors in the Elkhart Financial Corporation, and Your

3  Honor has announced what that amount requested would be.

4    I do think the amounts could change at the

5  restitution hearing upcoming, and that's based upon some

6  of the supporting documents that we have requested, and

7  some other collection efforts that we've made.

8    The United States is also requesting a forfeiture

9  money judgment in this case and that is in the amended

10 preliminary order of forfeiture.

11    Your Honor signed that preliminary order of

12 forfeiture and issued it at Document 25 on August 2nd,

13 2024, wherein that amended preliminary order of

14 forfeiture you've also authorized the seizure and

15 forfeiture of a particular cryptocurrency account.

16    To educate the Court and the parties on the

17 cryptocurrency account that we have named in the

18 preliminary order of forfeiture, there is a possibility

19 that we have a chance to recover some, a very small

20 portion, of the funds that were transferred out of

21 Heartland Tri-State Bank, and we believe that that

22 cryptocurrency account named in the preliminary order of

23 forfeiture contains some of those funds.

24    But the process is not easy.  It also follows a

25 different sort of procedure because they're not domestic,

08/19/2024      USA v. HANES      24-10013      20

1   quite frankly.  And so the United States must take

2   additional efforts to try to recover those funds.

3        And, finally, I know that the Court will make an

4   inquiry of what our positions are as to custody.  The

5   United States, Your Honor, would request that the

6   defendant be remanded to custody at the conclusion of

7   this hearing.

8        Once again, when we take into consideration the

9   staggering loss, the impact that this has had on victims,

10  the extremely high but correctly calculated sentencing

11  guideline range, the request of the United States for 264

12  months, and the seriousness of the offense, custody seems

13  to be the only decision that would make sense when we

14  weigh those factors.  And that's what the United States

15  would request in this case.

16        Your Honor, at this point, I have made my

17  statements.

18        My victim witness coordinator is ready to present

19  the victims.  She will just announce and name them and

20  have them come up to the podium, announce their name, and

21  record their name for the court reporter.

22        Thank you, Your Honor.

23        THE COURT:  So as you stand here today, you

24  still don't know what he hoped to get out of this

25  operation as far as the cryptocurrency?

08/19/2024     USA v. HANES     24-10013     21

1      It sounded like you don't know much of anything
2 about what was intended, who he was working with, how he
3 was going to profit from that.  Is that correct?
4          MR. SMITH:  So, I can say that from
5 communications that we know about, and from the pattern
6 of activity, it appears clear that the defendant intended
7 to make money.
8          It was represented as an investment opportunity; a
9 way to invest in crypto and rapidly turn a huge profit
10 for the defendant's benefit.
11         The defendant himself makes some of those
12 statements to the witnesses, the victims that you have
13 here today.
14         At some point, there is a discussion that he has
15 $69 million in an account.  That's not accurate, but
16 there is a discussion he has $69 million in an account.
17 But could be 200 million if he could just get the money
18 back, get it back to the bank.
19         There is a discussion with another victim that if
20 he could just get another 18 million -- actually this was
21 with the Board of Directors for the bank.
22         If he could just access another 18 million just
23 one last time to transfer it out, he is sure that all of
24 the money would come back, plus they would make a $20
25 million profit.

08/19/2024      USA v. HANES      24-10013      22

```
1        In some of the communications with the
2   co-conspirators, unknown co-conspirators, there is an
3   idea that this is an investment, that -- the opportunity
4   to make more money.
5        That -- I believe there is a mention that a
6   co-conspirator has an aunt that knows how these crypto
7   investments work and, surely, if we could just get more
8   money to unfreeze the funds, to guarantee the funds, what
9   you have invested will come back, plus you'll make a
10  profit.
11       I would also highlight that, as we know, it was
12  $47.1 million that was wired out of the bank, but there's
13  this representation later that it is 69 million that is
14  in his account and available to him.  So there is a
15  representation at some point that some sort of profit,
16  some sort of turning of the funds was occurring.
17       It's fake.  It's not true.  It didn't occur.  But
18  that appears to represent the defendant's motivation in
19  this case:  Make money.  Greed.  That's what the
20  cryptocurrency transactions were about.
21       It's the lure of easy money, as I represented in
22  the United States' sentencing guidelines.
23       It's like any get rich quick scheme.  It's evolved
24  over time.  It now exists on computer code, but it's the
25  same as any other opportunity to get rich quick.
```

08/19/2024    USA v. HANES    24-10013    23

1          THE COURT:  Okay.  I'll hear from the victims.

2          MR. MITCHELL:  Your Honor, my name is Brian

3   Mitchell.  I am a victim of the investment club, and also

4   the -- was a target of the scheme.  I am here reading on

5   behalf of my good friend Moe Houtz.

6          Moe has been in the hospital all weekend and just

7   got out and was not able to make the trip up here but he

8   asked me if I could, please, read his statement.

9          THE COURT:  Very well.  Thank you.

10         MR. MITCHELL:  Thank you, Your Honor.

11         Thirty years of working in adjacent offices did

12  not prepare me for the level of deceit that manifested

13  itself late July 2023.

14         Shan, I always knew you were incredibly

15  intelligent.  However, over the past 15 years I also

16  became increasingly aware of your ability to spin the

17  facts, or even omit certain facts, to sway others'

18  opinions more towards your point of view.

19         I felt that trait may come back to haunt you

20  someday, but I never dreamed Marla and I would become

21  some of your victims.

22         After reviewing your Sentencing Memorandum dated

23  August 6th, 1924 [sic] and submitted to the Court, this

24  trait continued to dominate your personality.

25         You stated the profitability issues with the

1  original two banks of the three-bank holding company

2  facilitated the sale of the First National Bank of

3  Elkhart.  This statement is misleading, at best.

4      Both banks maintained ROAs exceeding one percent.

5  For those unfamiliar with bank acronyms, return on

6  assets, ROA, is a quick measure of a bank's

7  profitability.  One percent and above is considered

8  solid.

9      What you omitted, Shan, is a fact that you were

10 fired by the previous holding company for transgressions

11 that were never made public to local board members, or

12 Elkhart residents.  It was then that local investors

13 formulated a plan to purchase First National Bank of

14 Elkhart from the original holding company.

15     A couple of years ago, Shan, you had an economist

16 from RBC Bank speak at our annual holding company

17 meeting.  Afterwards I asked him how much cryptocurrency

18 he had in his portfolio.  His response?  None, Mo.  It's

19 not tangible.

20     What do you really have to do when you make that

21 purchase?

22     I'll never forget your input to the discussion

23 that day, Shan.  You stated, and I quote, Most people who

24 invest in crypto, do so because it's unregulated, but

25 they have something they are trying to hide, unquote.

1           What were you trying to hide, Shan?

2           We had an investors' meeting with our county

3   attorney early this year after it was evident that you

4   were seeking a plea deal.  The purpose was to discuss

5   what we felt would be an acceptable sentence.

6           After a moment of awkward silence, the first

7   response was, As far as I'm concerned, if he is released

8   the day he dies, that will be one day too early.

9           Shan, that response was mine.

10          Seventy percent of my retirement that I worked 30

11  years to build disappeared overnight as a result of your

12  dishonesty.  It's been a very difficult pill to swallow.

13          Your Honor, I would also like to briefly comment

14  as a target of Shane's scheme of the cryptocurrency

15  scheme.

16          On July 5th, 2023, I was called to the bank where

17  Shan described his activities.  And what the counselor

18  just said about him requesting money, all we need -- at

19  that time, he needed $12 million from me and he said,

20  I'll give you -- I'll give you a million dollars at the

21  end of ten days, all I need is this 12 million and I can

22  get the rest of the money back.

23          I asked Shan twice in that meeting, Shan, is this

24  bank funds?

25          Shan said, No, it was personal.  Twice.

08/19/2024      USA v. HANES      24-10013      26

1           And in February of 2024, when the OIG Report came

2    out and the timeline, on July 5th, the day he called me

3    in, Shan had already stolen $34.7 million when he was

4    trying to steal another 12.

5           That afternoon after I turned him down, that

6    afternoon he stole another 8 million, if you look at the

7    timeline, and then that Friday, another 4.4 million.  I

8    have tried to reconcile this in my head.

9           And, Your Honor, the people that he stole from,

10   this lady right here, is one of the nicest ladies you

11   will ever meet.

12          These people right here are from my town.  They

13   are the most hard-working, dedicated, trustworthy people.

14   I am proud to be here with them.

15          The damage that is done by this I can only

16   describe in two words, Your Honor:  Pure evil.

17              THE COURT:  Thank you.

18              MS. HOUTZ:  My name is Marla Houtz.  I'm married

19   to Moe Houtz, my husband who could not be here today.

20          And for those of you that know me, I'm not an

21   angry person by any means but this has been really,

22   really difficult for myself and this whole group of

23   people to get through.  And I thank you for this

24   opportunity to read my victim statement.

25              Your Honor, Shan Hanes sits before this Court

1  today a convicted felon awaiting sentencing because he is

2  a deceitful cheat and a liar.  This has been a character

3  flaw of Shan's for many years.  He was just very good at

4  not getting caught.

5          Many other individuals that are not a part of this

6  horrific story have been affected by Shan's words,

7  actions, and untruths, as well.  Hopefully they can find

8  some peace knowing he is finally going to have to face

9  the consequences of his actions.

10         In preparation of this date I have written and

11  rewritten my victim statement countless times.  The

12  effects that Shan's actions have had on me and my family,

13  shareholders, bank employees, and the entire community

14  are lasting, detrimental impacts on a life-changing level

15  that most we'll likely never recover from.

16         Finding the words to effectively describe the

17  loss, shock, sense of violation, anger, confusion, and so

18  many other unpleasant emotions is a difficult, if not

19  impossible, task.

20         Shan Hanes, alleged to be upstanding leader of the

21  community but he used his positions of authority to

22  defraud his closest friends, family, co-workers, and

23  employees with total disregard for anyone other than

24  himself.

25         Your Honor, it stands to reason, and was even

08/19/2024    USA v. HANES    24-10013    28

1 pointed to in one of the OIG Reports as a primary factor

2 contributing to the fraud, that it is only because the

3 positions of authority and his perceived moral standing

4 in our small community that Shan Hanes could have

5 committed the substantial level of fraud that he has been

6 found guilty of.  Because of these circumstances, I feel

7 that Shan Hanes should receive the strictest sentence

8 allowable.

9      Your Honor, I would like to address the

10 sentencing memorandum submitted by Shan Hanes on August

11 7th.

12      The first paragraph of the document states that

13 the memo is submitted to aid sentencing by providing

14 beneficial background, and requests a reduced sentencing

15 range.

16      An examination of this document is required

17 because it contains lies and false statements, omissions,

18 and misleading and misrepresentative narratives.  All

19 those submitted as an attempt to illustrate that, other

20 than ripping off an entire community and failing a bank

21 by committing fraud, Shan is a good person that deserves

22 a lighter sentence.  This memo is yet another example of

23 Shan Hanes' dishonesty and flawed character.

24      In the memo, Shan Hanes states that he was hired

25 by the First National Bank of Elkhart in 1993 and later

1  made his way to president.

2        What Shan Hanes hopes to -- I mean, excuse me --

3  Shan Hanes omits and fails to state, is approximately

4  four years after his appointment as the president, he was

5  fired for cause by the chairman of the bank's board and

6  the majority shareholders.

7        It is true that Shan Hanes served on many of the

8  boards and committees stated in the memo, and it is true

9  that he testified before Congress.

10        In the memo Shan Hanes states that he has accepted

11  full responsibility for his actions.  Cooperating with an

12  FBI investigation, and pleading guilty, both in hopes of

13  reducing the consequences of his actions is hardly taking

14  responsibility, Your Honor.

15        Shan Hanes has never acknowledged his criminal

16  actions and apologized to my husband Moe for stealing 70

17  percent of his retirement savings and failing the bank

18  that took so many individuals painstaking efforts over

19  decades to build.

20        I asked the other victims present today, Has Shan

21  admitted his theft or apologized to any of you?  I don't

22  think so.

23        In the memo, Shan Hanes states that his efforts to

24  repay the loss are demonstrated by his repayment of the

25  $40,000 he stole from the Elkhart Church of Christ and

1  the 10,000 stolen from the Santa Fe Investment Club.

2      Shan's father wrote a check to pay the church, not

3  Shan, probably in complete embarrassment and shame caused

4  by the actions of his son.

5      In the statement, Shan Hanes puts forth

6  restitution as an argument for a lighter sentence.  Even

7  going so far as to site male lifetime expectancy rates.

8      Give me a break.  Shan owes the shareholders at

9  least $13 million, and the Government multiple tens of

10  millions more.  Arguing for a lower sentence by a number

11  of months quoted in the memo is completely false argument

12  and will make no material difference in the millions that

13  Shan stole and will never be able to pay back.

14      By that ridiculous argument, Shan shouldn't spend

15  more time in prison, he would argue he should be released

16  so he could start his job on the county road crew, write

17  his best selling book about internal controls, or go on a

18  paid interview with CNBC so he can fully repay the folks

19  he ripped off.

20      Give me a break.

21      I'd also like to point out that Shan Hanes tends

22  to present himself as the victim.  He mentions the

23  financial losses he took personally in the memo.

24      My dismay, Shan Hans states that he lost 60,000

25  taken from his girls' college fund.  Again, a total

1  misrepresentation.

2      He took the 60,000 from his girls' college fund

3  and he used the funds to put into what he thought was a

4  crypto investment.  His girls have worked their butts off

5  from the time they were in middle school mowing yards

6  around town, baby sitting, lifeguarding.  This was their

7  money and he took it.

8      So in closing, sadly, my husband who wanted to be

9  here today, believe me, more than you know, wasn't able

10  to make the trip.  He wasn't able to make it.

11      Going back to 2012 when the community bank became

12  a reality, why was the only CPA in the local bank passed

13  over as a potential member of the Board of Directors?

14      Moe was a very rash numbers guy, who understood

15  bullshit reasoning and not intimidated by title shame.

16      Moe would never tell you, or anyone else for that

17  matter, but I have no problem sharing, that this was

18  hurtful to him and a slap in the face.  He had his

19  clients' best interests at heart.

20      It is no secret that this was your choice, Shan,

21  not anybody else on the board.  It was your choice to not

22  have them there.

23      What did you not want him to know?

24      Thank you, Your Honor.

25          THE COURT:  Thank you.

1            MS. MURRAY:  Your Honor, my name is Stephanie

2    Murray, and I'm here to represent my husband Craig and

3    myself.

4            We are both products of Elkhart, Kansas.  We went

5    through the Elkhart school system, graduated high school

6    there.  We went on to receive our degrees, and my husband

7    went to the military.  We came back to live in Elkhart

8    and raise our two boys and since then we have retired and

9    we -- we call Elkhart our home.

10           Our roots run deep there.  We love the community.

11   We love its people.  They're good, honest, hardworking

12   people, and we're a community that looks after one

13   another and cares for one another.  And that's why this

14   has been such a difficult thing to understand how someone

15   that we all considered one of our own could betray the

16   people and the community in such a devastating way.

17           The decision to invest in the Heartland Tri-State

18   Bank was one we gave a lot of thought to, but we decided

19   it would be a good investment because we liked the idea

20   of having a home-owned bank, and we felt like it would be

21   good for our community.

22           The financial status of Heartland Tri-State Bank

23   was strong and we were confident in its growth because

24   two other banks had been purchased and for over ten years

25   we considered the bank investment to be secure.  All was

1 well, until seemingly overnight.

2     We received word that due to the actions of one

3 man, Shan Hanes, our investment, as well as many others,

4 was gone.  Just gone.  That is hard to understand.

5     My husband and I are both in our 70s, and we were

6 counting on this investment to help carry us through our

7 senior years.  Eventually we were planning on leaving our

8 bank shares to our boys as part of their inheritance.

9     Because of the events that transpired, and the

10 realization that everything was gone, it has been rather

11 stressful.  Craig and I both enjoy good health and have

12 always enjoyed good health but because of this difficult

13 circumstance, there have been many sleepless nights,

14 health issues, and anxiety over about -- over our future

15 and about the future of those that lost even more than we

16 did.

17     In reading several articles concerning this case,

18 and about Shan Hanes, I have been becoming increasingly

19 annoyed and irritated.  When I read about him being such

20 an intelligent person, who cares?  His intelligence or,

21 lack thereof, should not even be a factor .

22     Whether his IQ is 70, or 160, makes no difference.

23 This isn't an intelligence issue.  This is a breaking the

24 law/moral issue.  Wrong is wrong no matter what IQ you

25 have attached to it.

 1            Stealing is stealing, no matter how you try to

 2  spin it.

 3            The definition of "stealing" is taking or

 4  appropriating others' property or ideas without

 5  permission dishonestly or unlawfully, usually in a secret

 6  manner.

 7            Most people learn from an early age that stealing

 8  is wrong, and there are consequences to your actions.  I

 9  don't even pretend to understand the law but the fact

10  that on the federal level Mr. Hanes is being charged with

11  only one felony count is puzzling.

12            My understanding is that he made 11 separate

13  transactions.  I am thinking that if I were to steal

14  something from my neighbor's house on 11 different

15  occasions, I would be charged for each one of the 11

16  transactions or infractions.

17            How is this different?  I am sure there are

18  reasons under the law but, for me, it makes no common

19  sense.

20            The ramifications of Shan's actions go far beyond

21  the individual shareholders.  It has affected the whole

22  community.  A trust has been broken.  Families will be

23  affected for generations.  Businesses are hurting.  Jobs

24  have been lost.  And some are experiencing health issues.

25            As Christians, my husband and I believe that we

1  are called to forgive.  But we also believe that there

2  should be justice under the law, and that Shan should

3  suffer the consequences of his actions.

4       We are realistic enough to understand that our

5  investment is gone.  And that restitution for this amount

6  of fraud is impossible.

7       Our desire is to know how and why something like

8  this could happen.  How one person could assume that he

9  alone had the authority to make 11 separate wire

10  transactions to the tune of $47.1 million of other

11  people's money without remorse, without red flags being

12  raised, and without being questioned by anyone?

13       We pray for answers and we pray for justice.

14       Thank you.

15       THE COURT:  Thank you.

16       MS. OVERPECK:  Hello, Your Honor.  My name is

17  Traci Overpeck.  I appreciate the opportunity to speak

18  today.

19       And I just wanted to reiterate a couple of things

20  that I had on my impact statement.

21       For years at our bank staff meetings we had

22  discussed fraud.  At every monthly staff meeting, that

23  always came up.  We always discussed it.

24       Cryptocurrency came up multiple times.  We were

25  constantly talking about how to help our customers to

1  prevent them from being duped.  So much talk about scams

2  and customers not knowing who they were talking to.  We

3  wanted to keep them from being conned in to sending money

4  to someone they did not know.

5        How can an educated, CEO of a bank, fall prey to

6  any of this?

7        Or did he?

8        I think not.

9        Lastly, as I previously mentioned, Shan and I

10 lived across the street from each other.  We had

11 daughters that were the same age and were very good

12 friends in school.

13        Parents are tasked with raising their kids and

14 teaching them right from wrong.  When they do wrong,

15 there are consequences.  Shan is due to pay the

16 consequences for his mismanagement of the fiduciary

17 responsibility he was given.  Time for him to face the

18 consequences to the fullest extent of the law.

19        THE COURT:  Thank you.

20        MR. OVERPECK:  Thank you for giving me the

21 opportunity to speak, Your Honor.

22        I'm Patrick Overpeck, I'm Tracy's husband.

23        As she stated, we were neighbors with Shan.  She

24 has been employed with the bank for multiple years.

25        I may not be as eloquent as the speakers -- as

1  some of the other people up here.  I just want to point

2  out that Mr. Hanes -- or Shan, did not fall victim to a

3  scam.  He was intelligent, Your Honor.  He knew exactly

4  what he was doing.

5          The fact that he did it multiple times, over, and

6  over, and over, and there was never a successful result

7  to it should have been indication for anybody to know to

8  stop before you got to that point.

9          As our kids were growing up, my son, I used to

10 teach him that as you get older, you're held responsible

11 for your action.  You don't get to just bump fists and

12 say "my bad" and it will all go away.

13         I feel like Shan felt like he was smarter than the

14 people that were duping him.

15         I don't think it was a scam.  I think it was a ego

16 thing of him thinking he could get rich quick.  And there

17 was no -- nobody sitting behind me ever asked for that.

18         For all the years that we were involved in the

19 bank, everybody was thrilled with the results that the

20 bank provided in the return on our investment.

21         We're just like any other young

22 customer -- couple.  We could invest in the stock market.

23 Sure.  But unless you know about the stock market, you

24 are taking the same risk we took.

25         We invested in ourselves.  Following the direction

1 of Mr. Hanes -- or Shan, I hate to refer to him as

2 mister.  Excuse me.

3          But the people that invested in the bank were the

4 long-term employees of the bank.  They were -- we were

5 working together to make this work.  They were people in

6 the community that we looked up to and admired as good

7 people that we wanted to be involved.  So we invested our

8 money.

9          Is it a chance?  Absolutely.  We took a chance.

10 But we'll take a chance betting on ourselves versus

11 betting on the stock market.

12          There was no reason -- no reason, no one asked for

13 it, there was absolutely no reason for this to ever have

14 happened.  People could have went the next 20 years, 30

15 years, generations, as was pointed out, being happy with

16 the return that these people worked so hard to work for

17 themselves.

18          I have no idea what Mr. Hanes even thought could

19 be the reward for the risk he was willing to take.

20          There's no reward that would have been worth the

21 risk that you took.  You could have stopped way earlier

22 than driving the bus completely over the cliff with all

23 your family and friends in it.

24          But your ego wouldn't let you say, I made a

25 mistake.

08/19/2024      USA v. HANES      24-10013      39

1          So, Your Honor, I thank you for your time.

2          Again, I would just like -- I would personally

3    like to ask for the maximum sentence that the Court could

4    impose because as stated earlier, no amount of

5    restitution can ever be repaid.  All of us have already

6    wrote our money off.

7          The money's not the issue, it's the impact that

8    he -- one person made on multiple families, generation

9    families because we trusted him.

10         And I can tell you the -- there's only one person

11   that's responsible for this whole failure.  It's not

12   anybody that worked at the bank.  They did their job.

13         Shan is the number one person that's responsible

14   for this failure.  No one else.  The only thing we're

15   guilty of is we trusted that man too much.

16         But thank you for your time.

17            THE COURT:  Thank you, sir.

18            MS. JOHNSON:  Your Honor, the Court, my name is

19   Jo Johnson.  And I'm doing this financial impact

20   statement in honor of my 93-year-old mother, and my late

21   father.

22         My parents, Dee and Rosanne Panter, were original

23   investors in Elkhart Financial Corp. purchasing a

24   thousand shares on 11-1 of 2011.  They firmly believed

25   that this investment was an important way to support the

08/19/2024     USA v. HANES     24-10013       40

1   local community that they had grown to love.

2        They had built their home in 1961 and had moved

3   into the community.  Their investment purchase was not an

4   easy task for my parents, as they cashed in CDs, pulled

5   money from credit unions, cashed out treasury bonds,

6   scraped together cash, and even sold the family farm to

7   purchase the original shares.

8        Additional shares were purchased in 2015 and 2023.

9        In early May of 2023, in his bank office, Shan

10  advised my mother that purchasing more shares would be

11  advised.  Yes, less than three weeks later, the first

12  17.5 million was embezzled.

13       Last year, my brothers and I were devastated to

14  find that our parent's investment had been willfully

15  stolen and squandered by Shan Hanes.  Herein begins the

16  long-lasting financial impact of this terrible scheme.

17       My parents had planned well for their retirement.

18  This investment was to maintain them financially through

19  their elder years, to plan for growth at a steady rate

20  and, finally, to pass on the balance as inheritance.  My

21  father's now passed and would be heartbroken to find that

22  the plans that he had made for my mother's elder care had

23  been taken away by this theft.

24       As mom now requires 24-hour care, I and my brother

25  have, the last ten months, provided 14 hours of that care

1   daily to relieve the financial burden placed on her.

2       I am 69 years old and instead of being able to

3   enjoy my retirement as I see fit, I have been forced to

4   supplement my mother's financial situation.  The

5   dividends we are missing paid by Elkhart Financial

6   Corporation were mom's way of paying her taxes, her

7   insurance, and large purchases.  This has also been taken

8   from her.

9       In conclusion, Shan Hanes had no right to take my

10  parent's investment for his personal gamble and gain.

11      Shan Hanes had no right to deprive my mother of

12  her elder care and related expenses.

13      Shan Hanes had no right to cause both brothers and

14  myself countless hours of worry and mental anguish and

15  change of lifestyle to replace this loss of funds.

16      Shan Hanes had no right to break the trust given

17  him to make wise and informed financial decisions for the

18  Elkhart Financial Corporation, who is the holding company

19  for Heartland Tri-State Bank.

20      We feel deceived that the one man who scrutinized

21  our financial plans and methods for years was so easily

22  scammed.

23      I was even criticized once for actually knocking

24  off the extra cents in my checkbook and just rounding it

25  off to the next dollar:  50 cents up, 50 cents down.

08/19/2024     USA v. HANES     24-10013        42

1          We relied on his integrity, his honesty, only to

2   find that we had been duped.  These actions have crushed

3   the spirit of an entire community, caused grave financial

4   hardship, broken the trust of many, and left irreparable

5   uncertainty.

6          I'll close with Galatians 6:5.  "For we all are

7   responsible for our own conduct".

8          And I, like everyone else, agree that we have a

9   forgiving God and you have been forgiven of what you've

10  done.

11         I think you need to be responsible for your

12  actions.

13         Thank you.

14           THE COURT:  Thank you.

15           MS. HARRIS:  Your Honor, I'm Marla Harris,

16  another investor of Elkhart Financial Corporation.

17         You have my victims impact statement.

18         I also represent my son and daughter-in-law who

19  could not be here today.  You have their victim impact

20  statement.

21           THE COURT:  What are their names?

22           MS. HARRIS:  Aaron and Brenda Cromer.

23           THE COURT:  Thank you.

24           MS. HARRIS:  I am not eloquent, I am only going

25  to add a bit to what was said in my -- in all of our

1   statements here.

2        We're still dealing with the shock and the impact

3   of what this has done financially.  That's only one

4   aspect of this.

5        Discussion has been held over the trust issue.

6   Yeah, that's another part of it; we trusted Shan.

7        We believed in the community bank because of what

8   the bank had been to us in the past.  We wanted others in

9   the community to be able to share with that, so we went

10  into this thinking it was a good thing.

11       At that time my husband was alive, he came from

12  Wichita, a large town -- city.  He liked the community

13  bank idea and very much supported Elkhart.

14       My husband died nine years ago -- just over nine

15  years ago.  As soon as we knew that the bank had failed,

16  that all was lost, I immediately began marketing the

17  house that he and I built.

18       I lost all retirement when this went.

19       And as Jo mentioned, her dad would be heartbroken

20  to know the provisions he left for his wife are not there

21  for her elder care, mine aren't, either.  I thought, I'll

22  sell the house, that will be retirement if I can get out

23  in front of this thing.  Which I haven't yet.

24       Someone else mentioned the spiritual aspect of

25  this.  That's another very difficult item to address,

1  yes.

2       My creator says I have to forgive.  I am not ready

3  to forgive you, Shan.  But I have to.  And you put me in

4  the place of having to deal with my God and my creator

5  for something I didn't do.  That takes an awful lot more

6  than money to have to deal with.

7       Your Honor, these -- these folks from Elkhart are

8  people I've known all my life.  As my son said, they

9  invested in this bank, they have families.  That bank

10  kept the business wheel for those families turning, and

11  turning every year.  This could be relied upon.

12       I think enough time has gone by, I can clearly

13  grasp the changes.  The bank is not the same.  I miss the

14  bank.  It was an institution, a fine institution.

15       I thank you for being able to say my peace today

16  and I ask for a serious enough sentencing on this.  We're

17  not going to get back any money, I know that.  Nothing

18  can make restitution for the circumstances.  This altered

19  people's lives, their families' lives.  This is

20  generational.

21       I ask for a serious enough sentence to give some

22  justice to those things as well.

23       Thank you.

24          THE COURT:  Thank you.

25          MS. BURTON:  Good afternoon, Your Honor.  My

1  name is Mandy Burton.

2       First and foremost, thank you for this

3  opportunity.

4       Again, my name is Mandy Burton.  My husband's name

5  is Dennis.  We have resided together in Elkhart since

6  2010.  I actually grew up in Elkhart; it's my hometown.

7  We raised the last three of our six children all there.

8       Formerly I was a CFO BSA officer of Heartland

9  Tri-State Bank.  I first met Mr. Hanes in early 2011 when

10  he had been fired from his position with First National

11  Bank of Elkhart and he had started working at Colorado

12  East Bank and Trust where I was employed.

13       Mr. Hanes left CEB&T in the Fall of 2011 to form a

14  holding company to purchase First National Bank of

15  Elkhart.  Before he left, he told me he would be calling

16  me at a later date.  Mr. Hanes did call and he made me an

17  offer to work at First National Bank of Elkhart, and then

18  he asked to come by and meet with my husband and I to

19  discuss a financial opportunity.  He explained the

20  position he would like me to fill and the

21  responsibilities.  He then offered us the opportunity to

22  become shareholders of the holding company purchasing the

23  bank.

24       We were thrilled and excited to have this

25  opportunity.  We were informed of the initial budget for

08/19/2024    USA v. HANES    24-10013    46

1  the bank and the business plan for the future.  We both

2  looked forward to the dividends he projected.

3      I worked as a loan processer for two years, and a

4  BSA officer for one year before having the opportunity to

5  become the bank cashier and BSA officer.  I was very

6  excited and proud to have that chance to learn and grow.

7      In my new position I worked more closely with

8  Mr. Hanes than I ever had previously.  We traveled

9  together to many meetings, and numerous trainings.  In

10  this process we became good friends, as well as work

11  colleagues.  He trusted me to tell him all the things

12  that he needed to know, even if he didn't want to hear

13  it, and I had trusted him as well.

14      I believed for a very long time that I wouldn't

15  have had those learning opportunities or growing

16  experiences without Mr. Hanes giving me the job in the

17  beginning.  I now believe differently.

18      At Mr. Hanes' request and direction, I signed off

19  on eight of the ten wire transfers charged in this case.

20  When I questioned him, Mr. Hanes lied to me about the

21  reason for each one.  He repeatedly told me and others

22  that the wire funds were to help a loan customer and he

23  provided additional false explanations.  I now know that

24  the stories he told me were not true.

25      Mr. Hanes caused our bank to fail.  I was left to

1  assist with all the state and federal regulators and law

2  enforcement officials who descended on the bank after I

3  reported this issue to them.  I, with the regulators'

4  help, was tasked with keeping the bank liquid enough to

5  make it to Friday, July 28th.  There were times when I

6  did not know if we would be able do that.

7      Mr. Hanes' activities had depleted the banks

8  existing liquidity and maxed out our borrowing capacity.

9  I could not let any of the other employees know what was

10  really going on that week.

11      Per the regulators' instruction, I was required to

12  lie to all of my fellow colleagues and tell them we were

13  having a spot exam.

14      On Friday, July 28th, I stood with my fellow

15  employees and the bank's entire Board of Directors and

16  listened to the State of Kansas Banking Commissioner

17  declare our bank insolvent.

18      He announced our bank was closed and in FDIC

19  receivership.  A member of the FDIC team then told us we

20  all needed to work as late as possible that night and all

21  through the weekend to help them facilitate the transfer

22  of our bank to Dream First Bank.  They collected all of

23  our building keys and told us we would have to show ID to

24  get into the bank that we used to call ours.

25      This experience was very traumatizing for all of

 1  us.  By the time the FDIC exited our bank, I had worked

 2  21 days straight.  My mental and physical health both

 3  suffered greatly during that time.  I am still on anxiety

 4  and sleep medication due to all the stress.

 5      I have had to provide extensive information to

 6  numerous agencies that investigated the events that led

 7  to the bank's failure.  These agencies include the FDIC,

 8  FBI, Office of the Inspector General, and state and local

 9  law enforcement agencies.

10      Due to the bank failure, my husband and I suffered

11  a large financial loss.  Our initial investment was the

12  total of my husband's retirement from the Colorado State

13  Patrol.  I am 55 years old and my husband Dennis is 60.

14  We were counting on our bank investment as part of our

15  retirement savings.  Due to this loss, we will both be

16  working longer, perhaps much longer than we had intended.

17      We had looked forward to passing on our bank

18  shares and others we had a chance to acquire to our six

19  children and seven grandchildren, including to maybe help

20  pay for our grandchildren's education.

21      In addition, Mr. Hanes' actions caused me to lose

22  another retirement benefit given to the bank -- given to

23  me by the bank.  It was a 162 Retirement Plan.  FDIC

24  retained ownership of the bank-owned life insurance

25  policy that supported that plan.

1    Your Honor, we are not independently wealthy

2  people and the total financial loss caused by Mr. Hanes

3  is devastating.

4    At one time I believed Mr. Hanes to be one of the

5  smartest people I knew.  I also believed he had

6  integrity.  I don't believe either of those things now.

7    He repeatedly lied to me and other employees, and

8  the Board of Directors regarding the wires and the bank

9  funds.  He showed no regard for anyone but himself.  I do

10  believe he's smart enough to stop sending the money.  He

11  did not.

12    Respectfully, in our opinion, the plea agreement

13  does not address the magnitude of the crimes Mr. Hanes

14  committed.  Reverberations from his actions will be felt

15  in our community for a very long time.  The number of

16  shareholders affected financially, the total dollar

17  amount invested from those shareholders, and the banks'

18  funds far exceeds the conduct described in the plea

19  agreement.

20    Your Honor, we believe Mr. Hanes should receive

21  the maximum penalty applicable under the law.

22    Thank you.

23    THE COURT:  Thank you.

24    MR. SMITH:  Good afternoon, Your Honor.  Thank

25  you for the opportunity to speak with you.

08/19/2024    USA v. HANES    24-10013    50

1        THE COURT:  Yes, sir.

2        MR. SMITH:  My name is Dan Smith.

3        I am a victim.  I was a friend.  I was a

4   co-worker.  I was an employee.  I was a Director of

5   Heartland Tri-State Bank.  I worked with Shan for over 30

6   years.  We have built that bank.

7        I'd just like to know why would you do this?

8        You take -- you were at the top of your game, both

9   from state, federal, we had a very successful bank, both

10  federally and state inspected, profitable, as per our

11  projections when we put it together and contacted 33 of

12  our friends and family to invest in our idea of a

13  community bank.

14       And for whatever reason, you burnt it to the

15  ground.

16       You hurt your own family, your beautiful

17  daughters, your father, and friends that all believed in

18  you.  Why?

19       I don't understand it.

20       That's what I would like to know.

21       We're going to be hurt, the community, for

22  generations.

23       You know, if you take a dollar, spend it in a

24  community, they say it runs -- it turns over seven times.

25       Let's talk about $13 million.  Take that times 7,

1  times how many years?  You know?  It's -- that alone,

2  4-1/2 percent return, is about $88 million.

3          You know, that's what's been sucked out of our

4  community.

5          You know, you want to talk about belief in a guy,

6  I mean he integrated himself.  I don't know, I do not

7  understand why, because you know he is a leader in the

8  church, leader in the community, well engrained with

9  everything that took place.  You know, I'm sure it's all

10  in the victim impact statements.

11          Satisfaction wise, restitution is a long shot.  We

12  all know.  But I just don't believe any time of his

13  sentence should be any less than what it took people to

14  scrape together enough money to invest in that community

15  bank and that was so frivolously lost for him and him

16  alone.  It's not right.

17          Please see that its treated properly.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. TUCKER:  Your Honor, thank you for this

21  opportunity to address the Court.

22          I am presenting my statement today on behalf of my

23  parents, Bill and Sue, and my brother John, and myself,

24  Jim Tucker.  We were all shareholders of Heartland

25  Tri-State Bank.

1        In 1984, my dad, Bill Tucker, his brother, Carl

2   Tucker, and four other local residents chartered a bank

3   in Elkhart, Kansas known as First National Bank of

4   Elkhart at that time.  This bank successfully offered a

5   locally-owned option for financial services in our

6   community since that time.

7        In 2011 the ownership and name of the bank changed

8   to Heartland Tri-State Bank.  At this time, my brother

9   John and I had the opportunity to purchase shares and

10  become owners, also.

11       My dad, Bill Tucker, proudly served on the board

12  since 1984, and I had the opportunity to serve since

13  2015.  My dad was the chairman of the board at the time

14  of the collapse caused by Shan Hanes.

15       The impacts of the crimes by Shan Hanes includes

16  significant financial loss to our family.  Collectively,

17  the Tucker family owned 8,602 shares of Heartland

18  Tri-State Bank, a book value at the time of collapse of

19  $167.84, for a total loss of around $1,443,759.68.

20       This was a significant portion of our net worth.

21  Created over several decades, it was important when

22  securing loans for the operation of our farming business,

23  and was wealth that was planned to be passed on to our

24  future generations.

25       Additionally, Your Honor, this crime committed by

1  Shan Hanes has caused significant emotional and physical

2  stress for my family.  Since the discovery of this

3  problem at the bank, I have witnessed very high emotional

4  and physical stress on my parents.  The disappointment of

5  seeing a bank my dad worked so hard for decades to help

6  create in collapse, and not fully understanding why or

7  how this could happen, has been very difficult for them

8  to mentally digest.  Thoughts of the loss and unanswered

9  questions about it consume many hours of every day for

10  them.

11       My dad has had several health issues since July of

12  2023 and I believe the events of the bank have absolutely

13  compounded the situation, and his attitude.

14       I, too, have suffered tremendous physical and

15  emotional stress relating to the bank collapse.

16       I was first informed of the bank issue just prior

17  to going on a special trip with my wife to celebrate our

18  anniversary.  I returned from our trip to be consumed

19  daily with hours of meetings and phone calls regarding

20  the bank problem created by Shan.  This disrupted my

21  daily responsibilities as a husband, a dad, a son, and my

22  occupation as a farmer.

23       In August of 2023 I was taken by ambulance to BSA

24  Hospital in Amarillo, Texas with chest pain and elevated

25  troponin levels, likely due to the stress I incurred the

1    weeks prior.

2        Your Honor, I haven't officially kept track of the

3    hours of sleep I've lost, but I think the bags under my

4    eyes confirm it's a lot.

5        Additionally, our community has been significantly

6    impacted, also, and indefinitely.

7        At the time of the collapse and since that time,

8    fear of the unknown ripped through our community.  News

9    crews and journalists cast a negative, damaging light on

10   our community that will likely last a very long time.

11       A simple Google search of Elkhart, Kansas now

12   pulls up stories about Shan Hanes and the bank scam.

13       Additionally, with the new bank ownership that is

14   now not local, services previously provided have been

15   reduced, and they even intend to close a branch bank in

16   our neighboring town of Rolla, Kansas.

17       Trust, and decades of old banking relationships

18   are gone.  Several customers are even looking at other

19   options, and some are now even banking out of town

20   because of the disappointment in the new ownership.

21       Jobs have been lost at the bank.

22       It's tough to drive by that daily, Your Honor, and

23   see a new sign erected by our competition.  And see my

24   family's dreams, my community's efforts, wiped away.

25       A legacy is gone because of the sole actions of

1  Shan Hanes.

2       Your Honor, on the surface, Shan Hanes was an

3  upstanding and very involved member of our community.  As

4  you've heard others share, now we're all left to wonder

5  how sincere any of that ever was.  And it now appears

6  Shan Hanes is a person that had no problem stealing from

7  his church, his family, an investment club, and our bank.

8       Mr. Hanes did not make the board aware of the

9  situation for several weeks after it had begun at the

10  bank, and he did not have the authority from the board to

11  make any of the transactions he did.

12       It was and is particularly alarming to me that

13  when the board met with Shan once the situation at the

14  bank was discovered, and after he returned from allegedly

15  attending a week-long leadership conference in Idaho, he

16  was very nonchalant; not very remorse -- not very

17  remorseful.

18       In my opinion, Your Honor, I expected to hear a

19  crack in his voice, or see a tear in his eye, as he

20  explained the seriousness of the situation to the board,

21  but he didn't.  Instead, Shan Hanes tried to convince the

22  board to continue participating in his scam by approving

23  an additional $18 million that the bank didn't have, but

24  we could access it through a loan system we hadn't used

25  prior.

1          Shan told the board, and I quote, Guys, the people

2     I'm working with have built-in money for me.  They know

3     my career as a banker is likely over after this.  I will

4     need something to support me until my career moves on.

5          They know there will be a large tax burden for me

6     on the transactions in my name with such a large amount

7     involved.

8          They know our bank is out the interest on the

9     money pulled from investments in this time.

10          Guys, we will actually make about $20 million

11     income when this all clears, end quote.

12          Shan then explained that the bank had a $100

13     million bond and pleaded with the board that even adding

14     another $18 million to the initial $47 million would only

15     be $65 million, well under the $100 million bond.

16          We didn't make a decision at that time.

17          Later that evening, Shan Hanes sent a group text

18     message explaining that he had misspoke earlier in the

19     day, and that the bank actually only had a $2 million

20     bond.

21          It was pretty odd to me that Shan Hanes, the bank

22     president of the bank for 12 years, missed the bank

23     bonding amount by 98 percent.

24          The next day in a meeting with Shan Hanes, a

25     fellow board member made the quote -- quote, I'm just not

1  willing to bet the farm on your plan, end quote.

2      Shan Hanes' response?  Quote, David, I've already

3  bet it for you, end quote.

4      That was a stunning moment.

5      Since that time, seeing Shan Hanes carry on around

6  our town as normal for weeks and months following and

7  waiting for this day has been difficult for all of us.

8  Watching him walk into and out of the courtroom locally

9  with a smirk on his face, and visiting with attendees in

10  Elkhart, Kansas with seemingly not a care in the world

11  has been tough on shareholders and our community as well.

12      Your Honor, it just makes me wonder, what reward

13  was he expecting for all of this risk he took?

14      Did he expect a short sentence?

15      And/or have money hidden that only he or his

16  family or others could access?

17      That's a question I may never know the answer to

18  but it has definitely been on my mind.

19      Another question I have, Your Honor, is if this

20  crime committed by Shan Hanes doesn't deserve

21  consideration of the maximum possible sentence within the

22  sentencing guidelines for all the hurt you've heard

23  today, not just my family, others, but if this case

24  doesn't deserve the maximum, I'm curious what would?

25      In closing, Your Honor, it was not just the Tucker

1  family that was hurt by Shan Hanes' actions.  It was
2  every shareholder, every employee, these dozens of people
3  here, and dozens that couldn't be here he hurt.  And he
4  hurt them bad.
5      Every shareholder, every employee of Heartland
6  Tri-State Bank, not just in Elkhart, not just in Rolla,
7  Attica, and Arlington, Kansas, also, as you heard, some
8  shareholders lost their entire life savings.  Employees'
9  lives have been disrupted indefinitely and still are.
10      Our communities have been hurt by Shan Hanes'
11  actions.  All of this by a guy we trusted.
12      Shan Hanes knowingly and willingly stole from my
13  family and dozens of others in ways he will never be able
14  to repay.
15      It's our opinion a short sentence won't guarantee
16  the shareholder's loss of 12 to $13 million is ever
17  repaid.  And our opinion following the guidelines and
18  rewarding the maximum sentence may give my family and all
19  the others involved a renewed belief that law matters,
20  and that there are real and just consequences for taking
21  what isn't yours, seemingly without remorse.
22      Your Honor, thank you for listening.
23      It's my family's hopes that these comments will be
24  taken seriously when consideration is being given to the
25  sentencing.

1              THE COURT:  Thank you, sir.

2              MR. SMITH:  Your Honor, I believe there is no

3   further victim statements at this time.

4              THE COURT:  Thank you.

5         Mr. Stang.

6              MR. STANG:   Thank you, Your Honor.  May it

7   please the Court.

8         Would like to address a few things I've heard here

9   today.

10        First of all, my client feels awful about what

11  happened, but once the proceedings started, he couldn't

12  talk to any of the victims, specifically.  He was ordered

13  that down in the Morton County case.  So not being able

14  to talk to any of the victims here today was court

15  ordered.

16        I also generally advise clients not to talk to

17  potential witnesses and victims until a case is resolved

18  so I will take that on my head for him not talking to

19  them.

20        Mr. Hanes has no objection to the guidelines, nor

21  the computations, nor how it was determined.  He did all

22  those things.

23        We went through it.  Candidly, we were two points

24  off when we were first trying to figure out where he

25  would end up, but from the very beginning we knew it was

1  going to be somewhere between 36 and 40.

2        I keep hearing the question why.  I keep hearing

3  he was well respected, community leader, things of that

4  nature; intelligent.

5        Mr. Hanes did these acts.  He took this money.

6  There is no excuse for what he did.  Not going to try to

7  hide that.  He's not going to try to hide that.

8        Was it greed?

9        Was it being gullible?

10        Apparently he wasn't intelligent enough.

11        You can Google "pig butchering".  It happened.

12        Mr. Hanes did not profit from this.

13        Why?  The Court asked Mr. Smith, what do we think

14  the amount was?  Well, actually, I think at the time we

15  met with the U.S. Attorney's Office the fictitious

16  account he had been shown on the web page was about $209

17  million.  He was to take some of the money, and the rest

18  of the money was supposed to go back to the bank.

19        Now it's fiction; it didn't exist.  We all know

20  that now.  But it was to get money for him and for the

21  bank.  It failed big time.

22        Not -- again, there is no excuse to that.

23        And the way he got the money, I can't say there's

24  an excuse for that, either.  Just because he is a victim

25  of a fraud doesn't give him the right to take it from

1  somebody else.

2        But just so you know the history and background,

3  and I don't want to reiterate everything in my sentencing

4  memorandum, but his family lost about 1.1 million.  You

5  generally don't see that in a fraud scheme where you're

6  trying to steal from a bank or some type of account.

7        This isn't like the cryptocurrency king who had a

8  place down in the Bahamas and all those things.  He

9  doesn't have the money to pay anything back.  He's got to

10 work.  We have been trying to go through with the U.S.

11 Attorney's Office to try to make some of that restitution

12 payment.

13       I would agree with Mr. Smith.  By the time

14 Mr. Hanes gets out, there's not going to be a realistic

15 chance to reoffend:  A, he'll never be in a position to

16 do something like this again and, B, he's going be too

17 old.

18       The guideline does take a look at need for payment

19 of restitution.

20       Your Honor, I guess we can incarcerate Mr. Hanes

21 for 20 plus years, the cost of roughly a million dollars

22 to the United States Government.  I'd submit to the Court

23 it's not going to do an awful lot of good for that length

24 of time.

25       He does need to go to prison.  He does need to

1  spend a significant amount to -- because he caused a

2  great deal of harm, as the Court has heard today.  But

3  you need to give him an opportunity to pay some of the

4  restitution back.

5         Just going through the numbers, Mr. Hanes is 53

6  years old as he sits here today.

7         If we go with the Government's request of 264

8  months, he is 75 when he gets out.

9         Now, I'm not even talking about the Morton County

10  case at this point.  That's another, roughly, 7.2 years,

11  which would make him into his '80s.

12         Low guideline range he would be 72-1/2 years when

13  he got out; high guideline range 77-1/2.

14         I did not take into consideration potential 15

15  percent good time on those numbers, so I don't want to

16  mislead the Court on that.

17         I am going to cut to the chase.

18         I would think a sentence between the 19-1/2, which

19  is the low end, and 15 years, would be appropriate and

20  give him an opportunity to make some payments of

21  restitution.

22         If you went with think -- what's it?  Fifteen

23  years, if I'm not mistaken, is going to be roughly 68

24  years when he gets out, or 68 years old.

25         Part of the sentencing guidelines is an adequate

1    sentence but you also again want to consider the

2    restitution.

3        Should my client have known better?  Yes.

4        I mean I went through all the victim statements.

5    My client went through all the victim statements.  He

6    apparently did quite well up unto this point.

7        Again, not as an excuse but he -- you know, they

8    thought he was a good person.  He headed the financial

9    corporation, bought the bank.  Most the time you don't

10   put someone you don't think does a good job in that

11   position.

12       As I understand it, the bank was making decent

13   money, ten percent plus return during their time of our

14   economy, which was pretty unheard of.

15       But why?  And I don't have a good excuse for that.

16       Desperation.  He didn't -- he wants to make the

17   money back for the bank.  He got caught up in a scheme he

18   couldn't control.

19       My client is trusting the Court to do the right

20   thing today.

21       He has accepted responsibility.  I'd ask that you

22   let him stay out until the restitution hearing.  I've

23   also explained to my client the chances of that happening

24   is rather low, at best.

25       He is prepared to go into custody as we sit today.

1          But give him a chance to try to show the people of

2     Elkhart that he does want to try to make some of the

3     money back for them.

4          Thank you.

5              THE COURT:  Thank you.

6          Anybody here want to speak for this man, now's

7     your chance.

8              MR. STANG:  Your opportunity to say something if

9     you want to.

10             THE COURT:  Well, I'm waiting to see -- there's

11    a courtroom full of people here and I want to know if

12    anybody is here to say anything on his behalf.

13         I suppose not.

14         All right.  Mr. Hanes, now's your opportunity to

15    address the Court.

16             THE DEFENDANT:  Thank you, Your Honor.

17         I have been dreading this day for a long time and

18    from the -- from the deepest depth of my soul, had no

19    intention of ever causing the harm that I did.

20         And as I look at, first, my family, my wife, and

21    kids, and sister, and father, obviously, it's something

22    that they will deal with for -- for their entire life.

23         To the shareholders, they were my friends and

24    family, too.  And I'm sorry.

25         I think -- I think anyone would say that outside

1  of my family, what I spent the most time at was the bank,

2  every day, on nights and weekends.  And outside my

3  family, the bank was my next love and it was never my

4  intent to do what I ended up doing.  It was with the

5  intent of trying to get everything resolved and it wasn't

6  until it did end that I realized what kind of scam it

7  was.

8           And I wish I could say, and I wish the

9  shareholders and the community could understand, the

10  intent that wasn't there for my side, but I understand

11  what happened and I understand I was the cause of that.

12          And it's going to take years, if possible, for me

13  to forgive myself and I understand if the shareholders

14  don't.  I accept that.  Because I understand the hurt

15  from them because I see it -- I saw it in the statements,

16  I saw it as they were here today.  I saw it -- I haven't

17  slept a night since this happened, either.

18          And it is worrying about the community that my

19  daughters were all born and raised and grew up in and

20  knew all those kids and knew -- knew, as a couple of them

21  said, we were neighbors, we were friends.

22          And I'll forever struggle understanding how I

23  was -- how I was duped and how what I thought was just

24  getting the money back was making it worse.

25               THE COURT:  Well, everyone here has expressed an

08/19/2024      USA v. HANES      24-10013         66

1  interest in what you thought this was going to do and how

2  this was supposed to turn out, right?

3       So far I haven't heard anything that helps me

4  understand it.

5       You say you wish they could know what you were

6  trying to do?  Now's a good time to tell them.

7            THE DEFENDANT:  As I have now had a lot of time

8  to reflect, what I thought originally, and what I -- what

9  I reported to the board was what I thought was accurate

10 was not accurate, and I have had more time to reflect.

11      I even -- I went to Perth myself to try to get the

12 money back, trying to understand and --

13           [Sotto voce discussion had.]

14           THE DEFENDANT:  So, what started was, and

15 it -- as these crypto scams are, as I've learned, they --

16 they -- they grow, they build on each other so when it

17 comes back to what -- this "verify the funds" and as I

18 was working with what I thought was somebody who I

19 thought I could trust, and I had seen this person, talked

20 to this person -- not met in person but we had talked, I

21 was trying to just get the money back for the bank and

22 various reasons, which I thought were legitimate,

23 obviously weren't, but I had to what they called verify

24 funds and that is what I kept increasing.

25      I had to verify a million and a half with 3

1  million, and 3 million with 6 million, and that's how it

2  got out of hand.

3         The crypto that the company that I thought was

4  legitimate, and I was work with was in Perth, Australia.

5  We talked daily and it was strictly business.  But that's

6  where I thought the company was headquartered.

7         And when this really blew up and I understood the

8  depth of what was going on, and I understood there

9  was -- there was a massive scam involving more than one

10  country even, I wanted to do everything I could in my

11  limited power of resources and so I went to Perth with

12  the plans, communicated with them right up until landing

13  at the airport, and that's when I knew that it was all a

14  scam.

15         And at that point, obviously, it was too late.

16         THE COURT:  So you were going to fly to

17  Australia?

18         THE DEFENDANT:  I -- I did, Your Honor.

19         THE COURT:  When was that?

20         THE DEFENDANT:  January, middle of January I

21  believe.

22         MR. STANG:  Two weeks before the first

23  appearance.

24         THE DEFENDANT:  Yeah.

25         THE COURT:  Of what year?

08/19/2024     USA v. HANES     24-10013          68

1            THE DEFENDANT:  20 --

2            MR. STANG:  This year, Your Honor.

3            THE DEFENDANT:  -- 24.

4            THE COURT:  Okay.  Keep going.

5            THE DEFENDANT:  And I just, I -- it's so hard

6 every day.

7            And nothing else enters my mind all day long

8 except this, and understanding the many decisions that I

9 thought were good and every one of them turned out to be

10 wrong, and that's the struggle that I've got to the

11 shareholders, and to the bank, and to the employees, and

12 to the board.  What I thought I reported was truthful but

13 it wasn't.  I should have caught it but I didn't.

14            And now I'm dealing with the fallout of that from

15 a community that I spent 30 plus years at, to

16 shareholders that were my friends and family, and to my

17 very own family.

18            And at this point, being a former banker, all I

19 can think of is I have a huge unsecured loan that I need

20 to pay back and I want to do everything I can to pay as

21 much back as I can to my friends and family.

22            THE COURT:  Okay.

23            THE DEFENDANT:  Thank you, Your Honor.

24            THE COURT:  Court's required pursuant to 18 U.S.

25 Code, Section 3553(a) to impose a sentence that is

1  sufficient but not greater than necessary to comply with

2  the purposes of sentencing identified in that statute.

3       In determining the particular sentence to be

4  imposed, the Court has considered the United States

5  Sentencing Guidelines, which promote uniformity in

6  sentencing and assists the Court in determining an

7  appropriate sentence by weighing the basic nature of the

8  offense, as well as aggravating and mitigating factors.

9       The Court has considered the plea agreement,

10  statements of the parties, and the Presentence

11  Investigation Report.

12       After reviewing the presentence report, the Court

13  finds the sentencing guideline range of 235 to 293 months

14  is correctly calculated based on a Total Offense Level of

15  38, and a Criminal History Category of I.

16       The Court first considers the nature and

17  circumstances of the offense.  From on or about December

18  2022, to at least July 2023, the defendant executed a

19  scheme to defraud Heartland Tri-State Bank in Elkhart,

20  Kansas.  Specifically, during the time period of May

21  30th, 2023 to July 7th, 2023.

22       Defendant as Chief Executive Officer of Heartland

23  Tri-State Bank initiated a series of outgoing wire

24  transfers totalling 47,105,000 of Heartland's funds on a

25  cryptocurrency wallet.

1          Subsequent investigation revealed the funds were

2   transferred to multiple cryptocurrency accounts

3   controlled by unidentified third parties.

4          Defendant's actions resulted in the failure of

5   Heartland Tri-State Bank, which had to be taken over by

6   the FDIC.

7          Furthermore, defendant's actions cost millions of

8   dollars in losses to the bank's shareholders.

9          Court next considers the history and

10  characteristics of this defendant.

11         Mr. Hanes grew up in Oklahoma to married parents.

12         He is married and has three adult children.

13         He graduated college and was employed in the

14  banking industry for over 30 years.

15         He has no history of mental health or substance

16  abuse concerns and prior to this event, he had no,

17  criminal history.

18         First of all, before I proceed any further, I want

19  to address the victims in this matter.

20         This is one of the most troubling cases that I

21  have had to deal with, outside of the child pornography

22  and child molestation perspective in the sense of victim

23  impact.  And what I would say to you is that my

24  suggestion to you is the best thing for you, is for you

25  to forgive this man because if you set him free, you set

1  yourself free.

2       Leave matters of retribution to me.  That's my job

3  and I will see that it's done.

4       But as for you, I know it's hard to turn loose of

5  things when much has been taken from you, but trust has

6  been breached, your life savings in many cases ripped out

7  from under your feet.  It impacts your plans for

8  retirement, inheritance, what you do for your children,

9  grandchildren, for many of you how you will make it

10 day-to-day in the days ahead, many of you particularly

11 who are already at the stage of retirement and you were

12 planning on enjoying that part of your life with the

13 money that this defendant took from you and squandered.

14      So I know those are not easy things to put behind

15 you but he's already -- he's already taken enough from

16 you, don't let him take your joy as well.

17      As it turns to you, Mr. Hanes, we've already heard

18 plenty about the breach of trust, the consequences that

19 you -- your illegal conduct has caused to these people,

20 and many others.  I think sometimes to someone who's

21 hearing this, or perhaps reading about it in the

22 abstract, it may be hard to grasp the intangible impact

23 of what you have done.

24      We can all look at numbers on paper and, you know

25 feel sorry for those that are hurt.  But the hurt, the

08/19/2024    USA v. HANES    24-10013    72

1  injury, runs far deeper than numbers on paper.  You know,

2  I can tell from my reading of the presentence report, the

3  victim impact statements, and listening to what's been

4  said here in the courtroom, that your misconduct has

5  injured your community in a way that is not easily

6  captured with words.

7       You know, we live in an age where people don't put

8  as much stock I think in truth and integrity as they

9  should.

10      Certainly we get that impression from media and

11 from perhaps the way people conduct themselves, and some

12 of the bigger cities demonstrate lack of care and concern

13 for their fellow man.

14      But, you know, out here on the southern plains, I

15 think there is still a sense that community means

16 something, and that a man's word is still his bond.  And

17 that while you have to look out for people that don't

18 know, maybe you really shouldn't have to look out so much

19 for the ones you do.  Or the ones that you think you do.

20      And so in that sense, the injury runs deep, and I

21 have gleaned from presentence report, hearing from the

22 victims, the important role that the bank plays in that

23 community, it's more than just a place where you deposit

24 your funds and write your checks.  It is an integral part

25 of business, farming, and investment, estate planning,

1  and all the other things that got done through that bank.

2  And people did it with a sense of trust, and care, and

3  concern for one another.

4       I don't know all the details of it, I'm sure that

5  someone could criticize that assessment, but plenty of

6  examples where someone slighted someone else.  That's not

7  what I am talking about.  But I am talking about the

8  broader sense that this case represents the betrayal of

9  trust that's not easily captured in sentencing guidelines

10  and sentencing tables, and all those sorts of things, and

11  one of the things that I have to do is see that justice

12  is done.

13       We live in a free republic.  One of the things

14  that we rely on is a justice system that ensures that

15  people can get justice pursuant to a rule of law and,

16  therefore, they don't have to do the things that people

17  have historically had to do to obtain justice.

18       Human beings, by their very nature, need to see

19  that justice is done and, historically, in countries and

20  areas where you don't have a functioning court system and

21  justice system, people have had to tend to that on their

22  own and, unfortunately, money, and might, and power have

23  often played an outsized role in how those sorts of

24  justices -- or justice in those kind of systems is

25  implemented.

08/19/2024    USA v. HANES    24-10013    74

1          But the court system provides a place where all
2    people can stand equal before the law, doesn't matter how
3    rich, or strong, or anything else that they are, and they
4    can see that justice gets done.
5          And that's why I think that that sentencing factor
6    under 18 U.S. Code, Section 3553 is so important.  People
7    need to leave here feeling like justice is done, so they
8    don't feel the need to somehow augment that themselves.
9    So I'm taking that into account here.
10          I think one of the other factors that I am to
11    consider is the need to deter future misconduct like
12    this.  And it's true that I doubt that you personally are
13    to going to engage in this because you lost the
14    credentials and other things that would allow you to
15    engage in this sort of activity in the future, but other
16    people in similar roles faced with similar thoughts about
17    engaging in this kind of misconduct need to know that it
18    comes at a price, and a heavy one at that.
19          So I think that factor weighs heavy -- or weighs
20    in favor of a significant sentence, to ensure that in the
21    future, bank officers, people in similar roles to yours,
22    don't underestimate the consequences of this sort of
23    betrayal.
24          I think the sentencing guidelines provide me with
25    input on ensuring consistency in sentencing and avoiding

08/19/2024      USA v. HANES      24-10013      75

1   unwarranted sentencing disparities.

2       I know it has been brought to my attention this

3   case down in Texas where someone got away with more money

4   and received less of a sentence than that suggested by

5   the guidelines in this case, but I think the -- some of

6   the considerations explained by the Government convince

7   me that that case has little sway here and that that

8   involved -- the Government program that's -- I don't

9   mean to diminish the significance of embezzling or

10  stealing from a Government program, but here the

11  collateral consequences were a lot more than they were in

12  that case.

13      Here, not only do you have the FDIC and the impact

14  that that agency then spreads on to members of our

15  community and country at-large, but also the individual

16  impacts to the people whose lifesavings were taken from

17  them, and all the damage that ensued in this community.

18      So those are the factors that stand out to me in

19  this case and inform my decision here.

20      The business about your intellect, your grades,

21  all that stuff, to me, that just raises the standard of

22  accountability.  You knew better.  You were not a fool.

23      As a bank officer, I would expect you to be

24  well-versed in identifying schemes like this and teaching

25  people how to avoid them; not to fall for it yourself.

1        You had multiple opportunities in this case to put

2    a stop to it.  Every time you generated a new wire there

3    was a -- an opportunity to put an end to this.  Instead,

4    you dug yourself deeper and deeper.  I don't see a basis

5    for a downward variance or even the low end of the

6    sentence.

7        After considering all that, everything else I'm

8    supposed to consider under the statute, and under the

9    sentencing guidelines, I intend to sentence this

10   defendant to 293 months in prison, to be followed by

11   three years supervised release.

12       I believe that sentence is sufficient but not

13   greater than necessary to meet the 3553(a) sentencing

14   factors.

15       The supervised release term, in addition to the

16   imprisonment sentence, will allow this defendant the

17   opportunity to receive correctional treatment in an

18   effective manner and assist with community reintegration.

19       I am going to order a special assessment of $100

20   to the Crime Victims Fund.

21       The Court does not intend to impose a fine, as

22   imposition would hinder his ability to pay restitution.

23       The Court intends to order forfeiture of the

24   property outlined in the preliminary order of forfeiture

25   filed by the Court previously.

1    Court intends to impose restitution but will delay

2  the ultimate findings on restitution for a later hearing

3  as I'm authorized to do by statute.

4    For what it's worth, the arguments related to

5  reducing his custody sentence to allow him to pay back

6  restitution, frankly, I'm not terribly optimistic that

7  whether he serves 15, 20 years or the sentence that I

8  impose here, that restitution is particularly likely.

9    This man's going to get out of prison after many

10  years with a felony conviction.  I don't know that it's

11  terribly likely that he is going to go out and find a

12  good paying job to make this money back.  I don't even

13  know what financial opportunities would be available then

14  to a person with his sort of criminal record, so I am

15  going to order restitution, but I don't think anyone in

16  this courtroom feels particularly optimistic that much of

17  it is going to get paid back.

18    But in the event he hits the lottery, or somehow

19  comes upon some investment that pays off in a big way for

20  him down the road, if he -- if he is so fortunate, then

21  restitution order will ensure that any -- anything like

22  that will run on the benefit of those who lost money due

23  to his schemes in this case.

24    Court intends to impose the mandatory, standard,

25  and special conditions of supervision as set forth in

1  Part D of the presentence report.

2          Defendant will have no contact with the victims in

3  this offense.

4          This condition will afford adequate deterrence to

5  criminal conduct and protect the public from further

6  crimes of this defendant.

7          He is restricted from engaging in employment or

8  other activity that would enable him to have

9  discretionary authority over financial matters.

10          Because this defendant stole from a previous

11  employer this condition is needed to protect future

12  employers.  This condition will provide adequate

13  deterrence to criminal conduct and protect the public

14  from further crimes of the defendant.

15          Financial conditions restricting new credit,

16  charges, or accounts, providing release of information

17  forms to probation office to access financial information

18  is necessary to ensure restitution is paid to the victims

19  and protect the public from further crimes of the

20  defendant.

21          Search condition is appropriate given the nature

22  of the offense.  It will provide adequate deterrence to

23  criminal conduct, and protect the public from further

24  crimes of the defendant.

25          Given the harm to the community, the severity of

1  the sentence, everything else I am supposed to take into

2  account, voluntary surrender is denied.

3         Defendant will be remanded to the custody United

4  States Marshal at the conclusion of this hearing.

5         Any objections?

6             MR. SMITH:  No objections by the United States.

7             MR. STANG:  None by defense, Your Honor.

8             THE COURT:  Very well.

9         Defendant will rise for imposition of sentence.

10        Court determines that the Presentence

11 Investigation Report and the previously stated findings

12 are accurate and orders those findings incorporated in

13 the following sentence:

14        Pursuant to the Sentencing Reform Act of 1984, it

15 is the judgment of the Court that the defendant, Shan

16 Hanes, is hereby sentenced to the custody of the Bureau

17 of Prisons for a term of 293 months.

18        This term of imprisonment shall be followed by

19 three years of supervised release.

20        Within 72 hours of release from the custody of the

21 Bureau of Prisons, the defendant shall report to the

22 probation office in the district in which he is released.

23 While on supervised release custody he shall -- or the

24 defendant shall comply with the mandatory and standard

25 conditions adopted by this Court, and the special

1   conditions of supervision as set forth in Part D of the

2   presentence report.

3          It is ordered the defendant shall pay the United

4   States a special assessment of $100 to the Crime Victims

5   Fund.  Payment of the assessment is due immediately.  It

6   may be satisfied while in Bureau of Prisons' custody.

7          Imposition of a fine waived.

8          Pursuant to 18 U.S. Code, Section 3663(a), the

9   Court intends to impose restitution but delays

10  restitution findings for a period not to exceed 90 days,

11  as permitted by statute.

12         We'll set a follow-up hearing to establish the

13  factual basis for restitution and get that matter

14  decided.

15         The preliminary order of forfeiture is made final

16  as to this defendant and shall be incorporated in the

17  judgment.

18         Both the Government and defendant are advised as

19  to their respective rights to appeal this sentence and

20  conviction.  An appeal taken from this sentence is

21  subject to 18 U.S. Code, Section 3742, and subject to any

22  waiver in the plea agreement.

23         The defendant is advised it is your right to

24  appeal the conviction and sentence, but only to the

25  extent you have not waived that right in the plea

1  agreement.

2      You also can lose your right to appeal if you do

3  not timely file a notice of appeal in the District Court.

4      Rule 4(b) of the Federal Rules of Appellate

5  Procedure gives you 14 days after entry of judgment to

6  file a notice of appeal.

7      If so you request, the clerk of court shall

8  immediately prepare and file a notice of appeal on your

9  behalf.

10     If you're unable to pay the costs of an appeal,

11 you have the right to apply for leave to appeal in forma

12 pauperis.

13     Defendant is remanded to the custody of the United

14 States Marshal pending the restitution hearing in this

15 matter.

16     Is there anything else to be taken up today?

17     MR. SMITH:  Not by the United States.

18 Thank you.

19     MR. STANG:  Not by defense, Your Honor.

20     THE COURT:  Very well.  Court's in recess.

21 (Proceedings conclude at 3:12 p.m.)

22 *******************************************

23          C E R T I F I C A T E

24     I, Jana L. McKinney, United States Court

25 Reporter in and for the District of Kansas, do hereby

1  certify:

2        That the above and foregoing proceedings were

3  taken by me at said time and place in stenotype;

4        That thereafter said proceedings were

5  transcribed under my discretion and supervision by means

6  of transcription, and that the above and foregoing

7  constitutes a full, true and correct transcript of

8  requested proceedings;

9        That I am a disinterested person to the said

10  action.

11        IN WITNESS WHEREOF, I hereto set my hand on

12  this, the 22nd day of August, 2022.

13

14        s/ Jana L. McKinney
          Jana L. McKinney, RPR, CRR, CRC, RMR
15        United States Court Reporter

16

17

18

19

20

21

22

23

24

25

<u>I N D E X</u>

                                                    <u>PAGE</u>


GOVERNMENT SENTENCING RECOMMENDATIONS              5
VICTIM IMPACT STATEMENTS:
   MR. MITCHELL                                    23
   MS. HOUTZ                                       26
   MS. MURRAY                                      32
   MS. OVERPECK                                    35
   MR. OVERPECK                                    36
   MS. JOHNSON                                     39
   MS. HARRIS                                      42
   MS. BURTON                                      44
   MR. SMITH                                       49
   MR. TUCKER                                      51
DEFENSE SENTENCNG RECOMMENDATIONS                  59
ALLOCUTION                                         64
IMPOSITION OF SENTENCE                             68


REPORTER'S CERTIFICATE                             82